[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 146.]

THE STATE OF OHIO, APPELLEE, *v*. TIBBETTS, APPELLANT.

[Cite as *State v. Tibbetts*, 2001-Ohio-132.]

*Criminal law—Aggravated murders—Death penalty upheld, when.*

(No. 98-1970—Submitted January 9, 2001—Decided July 5, 2001.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B9708596.

————————————

COOK, J.

{¶ 1} The appellant, Raymond Tibbetts, was convicted of the aggravated murders of Judith Sue Crawford and Fred Hicks. He was sentenced to death for Hicks's murder and life imprisonment without parole for Crawford's murder. Tibbetts presents fifteen propositions of law for our consideration. For the reasons set forth below, we affirm the judgment of the trial court, including the death sentence.

I

{¶ 2} On November 6, 1997, Hicks's sister, Joan Hicks Landwehr, arrived at Hicks's home in Cincinnati to meet him for lunch. Landwehr often visited Hicks, who was sixty-seven years old and suffered from emphysema. Due to his condition, Hicks employed Crawford as a live-in caretaker. Tibbetts, who had married Crawford just over a month earlier, also lived in the house.

{¶ 3} After getting no answer at the door and seeing Hicks's car missing from its usual parking space, Landwehr entered the home with her spare key. Landwehr went to a second-floor living room and found Hicks's dead body slumped in a chair. Landwehr immediately called 911. Landwehr noticed that her brother's chest and stomach were bloody and that his right pants pocket, where Hicks usually kept his money, was turned inside out.

**{¶ 4}** When Cincinnati police officers responded a short time later, they found Hicks with a tube still connecting his nose to a nearby oxygen tank. Two knives protruded from Hicks's chest, a third knife protruded from his back, and the broken blade of a fourth knife was also in his back. Officers found additional knives and a knife sheath near Hicks. A butcher block used to store knives lay behind Hicks's chair. Deputy coroner Daniel Schultz later determined that Hicks died as a result of multiple stab wounds to his chest that punctured Hicks's heart, lungs, and aorta. Hicks did not have any defensive wounds.

**{¶ 5}** Officers searched the rest of the house and found Crawford lying dead on the floor of a third-floor room, covered with a sheet. Crawford had been brutally beaten; her head was cracked open and lay in a pool of blood. Pieces of Crawford's brain were lying on the floor next to her head. Crawford had also been stabbed several times, with one knife still stuck in her neck. Crawford also had a broken left arm, which Dr. Schultz characterized as a probable result of her attempt to ward off blows. Police found a bloodstained baseball bat and several knives near Crawford's body. Dr. Schultz concluded that Crawford died of multiple skull fractures and that at least nine of her stab wounds were inflicted after her death. In all, Crawford had been struck at least four times in the head with blunt-force blows and sustained stab wounds to her back, lungs, chest, arm, shoulder, and neck.

**{¶ 6}** Dr. Schultz, who also investigated the crime scene, determined that Hicks and Crawford had been dead for several hours. Police investigators found no identifiable fingerprints on the baseball bat or the knives. The only fingerprints found in the house belonged to either Tibbetts or Crawford. There were no signs of forced entry anywhere in the residence. Police also learned from Landwehr and others at the scene that Hicks's car, a white Geo Metro, was missing. Landwehr told police that Tibbetts did not have permission to drive the car.

**{¶ 7}** The day after discovering the bodies, Cincinnati police learned that a Covington, Kentucky police officer had stopped Tibbetts on the night of the

murders. Just after midnight on November 6, 1997, Covington police lieutenant Michael Kraft found Tibbetts in a white Geo Metro that had broken down in the middle of an intersection. According to Kraft, Tibbetts appeared nervous and "smelled somewhat of intoxicants." Tibbetts also lied to Kraft about the car's owner, saying that the car belonged to a friend in Covington.

{¶ 8} Kraft summoned another officer to the scene to assist Tibbetts and investigate whether Tibbetts was driving under the influence of alcohol or drugs. Officer David Finan arrived a short time later and also noted that Tibbetts was nervous and smelled of intoxicants. He allowed Tibbetts to go, however, after concluding that Tibbetts was not under the influence of alcohol or drugs. The car was towed away and impounded by Covington police. Cincinnati police later recovered the Geo Metro from the Covington impoundment lot and found bloodstains on the steering wheel, gearshift, door panel, and brake handle.

{¶ 9} After learning of the Covington police's encounter with Tibbetts, Cincinnati police charged Tibbetts with receiving stolen property and obtained an arrest warrant on November 7, 1997. The very next day, Tibbetts voluntarily admitted himself to the psychiatric unit at St. Elizabeth Hospital in Edgewood, Kentucky. Tibbetts told nurses that his name was Ray Harvey and provided an incorrect Social Security number. Despite the false name and identification information, nurses at the psychiatric unit recognized Tibbetts from his previous treatment at the hospital. On the same day that Tibbetts checked into St. Elizabeth, police arrested Tibbetts on the warrant for receiving stolen property and took him to a local jail for questioning.

{¶ 10} Tibbetts signed a waiver of his *Miranda* rights and calmly cooperated with the two investigating officers who questioned him. Tibbetts had a noticeable cut on his hand and told the investigators he had cut his hand on a river barge where he had been staying. When an officer asked whether Tibbetts had seen his wife lately, Tibbetts responded that he had not and then terminated the

interview. As police were leaving, Tibbetts queried, "What's the charge, manslaughter?" The investigators, who had not mentioned the murders to Tibbetts during the interview, responded that the matter was under investigation.

{¶ 11} A few days later, a Cincinnati police officer retrieved from St. Elizabeth the clothing Tibbetts was wearing when he checked himself into the psychiatric unit and took it to the crime lab for DNA testing. The socks, T-shirt, and blue jeans Tibbetts was wearing on November 8, 1997, were all stained with human blood. A serologist found that the blood on Tibbetts's T-shirt matched Tibbetts's blood, that blood on the socks matched Hicks's blood, and that blood on the blue jeans matched blood from Tibbetts, Crawford, and an unknown person. The serologist also analyzed blood found in the Geo Metro and concluded that blood on the door, brake handle, and gearshift matched Tibbetts's blood.

{¶ 12} A Hamilton County grand jury indicted Tibbetts on four counts of aggravated murder (two counts per victim) with death-penalty specifications. The first and third counts alleged aggravated murder with prior calculation and design. R.C. 2903.01(A). The second and fourth counts charged aggravated murder in the course of committing aggravated robbery. R.C. 2903.01(B). Each count carried two death-penalty specifications: (1) a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04(A)(5); and (2) murder while the principal offender in an aggravated robbery, R.C. 2929.04(A)(7). A fifth count in the indictment charged Tibbetts with aggravated robbery in connection with the theft of Hicks's car. R.C. 2911.01(A)(3).

{¶ 13} A jury returned guilty verdicts on three counts of aggravated murder. On these counts, the jury also found Tibbetts guilty of each death-penalty specification. The jury found Tibbetts not guilty on count one, the aggravated murder of Crawford with prior calculation and design, but found him guilty of the lesser included offense of murder. R.C. 2903.02. The jury also returned a guilty

4

verdict on the aggravated-robbery count. The trial court merged the murder verdicts into two counts for purposes of sentencing.

{¶ 14} At the conclusion of the penalty phase, the jury recommended that Tibbetts be sentenced to death for the Hicks murder and to life imprisonment without parole for the Crawford murder. The trial court adopted the jury's recommendation and sentenced Tibbetts accordingly. The cause is now before this court upon an appeal of right.

II

{¶ 15} Tibbetts presents fifteen propositions of law for our consideration. Although a capital defendant has an appeal of right to this court, R.C. 2929.05 does not require us to discuss in opinion form each proposition of law raised. *State v. Davis* (1996), 76 Ohio St.3d 107, 110, 666 N.E.2d 1099, 1104. We summarily overrule those propositions of law that have previously been resolved by this court and address only those issues that warrant discussion.[1] *Id.* See, also, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 568, 570.

---

1. We summarily reject the seventh proposition of law (constitutionality of requiring mitigating factors to be proven by preponderance of evidence) on authority of *State v. Seiber* (1990), 56 Ohio St.3d 4, 15-16, 564 N.E.2d 408, 421. See, also, *Walton v. Arizona* (1990), 497 U.S. 639, 650, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511, 526. We reject the eighth proposition of law (propriety of Ohio's definition of "reasonable doubt" in R.C. 2901.05[D] as applied to the penalty phase of a capital prosecution) on the authority of *State v. Goff* (1998), 82 Ohio St.3d 123, 131-132, 694 N.E.2d 916, 923-924. The ninth proposition of law attacks the constitutionality of Ohio's death penalty scheme on various grounds. We have considered all of these issues and summarily reject them. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Buell* (1986), 22 Ohio St.3d 124, 135-142, 22 OBR 203, 213-218, 489 N.E.2d 795, 806-811; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598, 607-608; *State v. Mills* (1992), 62 Ohio St.3d 357, 371-372, 582 N.E.2d 972, 985-986; *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, paragraph one of the syllabus; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 670-671; *State v. Carter* (2000), 89 Ohio St.3d 593, 606-608, 734 N.E.2d. 345, 357-359.

III

**{¶ 16}** In his first, third, and fourth propositions of law, Tibbetts attacks the trial court's alleged failure to provide adequate funds and expert assistance necessary for his defense. Although the trial court provided funds for a mitigation specialist, clinical psychologist, and forensic psychiatrist, Tibbetts contends that he needed more funds to retain additional experts. We reject these claims.

**{¶ 17}** As a matter of due process, an indigent defendant in a capital case is entitled to the basic tools with which to conduct an adequate defense. *Ake v. Oklahoma* (1985), 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53, 62. In *Ake*, the United States Supreme Court concluded that the state must provide a psychiatric expert for the defense when the defendant has made a preliminary showing that his sanity will be a significant factor at trial. *Id.* at 74, 105 S.Ct. at 1091, 84 L.Ed.2d at 60. Although *Ake* dealt only with a defendant's entitlement to a psychiatric expert, this court has recognized that due process may require the state to provide other types of expert assistance to an indigent criminal defendant. See *State v. Mason* (1998), 82 Ohio St.3d 144, 149, 694 N.E.2d 932, 943. Moreover, R.C. 2929.024 requires the trial court to provide expert assistance when "reasonably necessary for the proper representation of a defendant charged with aggravated murder." We have accordingly held that the state must provide an indigent criminal defendant with funds to obtain expert assistance when the defendant has made a particularized showing that (1) there exists a reasonable probability that the requested expert would aid the defense and (2) denial of the requested expert assistance would result in an unfair trial. *Id.* at syllabus. The trial court uses its sound discretion in determining whether a defendant has made a particularized showing of the need for state-funded expert assistance. *Id.*

**{¶ 18}** In this case, Tibbetts made no request in the trial court for any of the experts he now argues were necessary for a fair trial. We will ordinarily not consider an error that the complaining party could have called to the trial court's

attention but did not. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Tibbetts has therefore forfeited all but plain error. Although Crim.R. 52(B) authorizes us to take notice of a plain forfeited error, we do so only "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 19} Tibbetts makes a general assertion in his first proposition that he was "hamstrung by a lack of funds" and that he was prejudiced by an inability to hire "an investigator or a coroner" and a crime scene investigator. Tibbetts's conclusory argument offers no particularized showing about how these experts would have aided his defense. It was obvious from the condition of the victims' bodies that both were murdered; the only question was the identity of the murderer. Because cause of death was not an issue, it is unclear what value a "coroner" would have provided to the defense. Moreover, the defense relied heavily at trial on Tibbetts's contention that he did not remember killing the victims and that he was heavily intoxicated on the day of the murders. Defense counsel did not need a crime scene investigator to help develop that defense. We therefore reject Tibbetts's first proposition.

{¶ 20} Tibbetts's third proposition asserts that he needed an independent pathologist to assist him at both the guilt and sentencing phases of the trial. Again, Tibbetts makes no particularized showing how such an expert would have been needed for a fair trial. He simply makes the broad assertion that an independent pathologist "could have conducted his own investigation and testing, and also contested the State coroner's methodology and findings in regard to the cause, manner, and timing of death." But there was no mystery surrounding any of these aspects of the case. There was no doubt as to the cause of death, and the defense

did not raise an issue regarding the timing of death. Thus, Tibbetts has failed to show that a pathologist was needed for a fair trial.

{¶ 21} The fourth proposition contends that Tibbetts needed an expert neuropharmacologist. Tibbetts argues that a neuropharmacologist would have established that Tibbetts was under the influence of alcohol and drugs at the time of the murders and that his intoxication contributed significantly to his "inability to consider the ramifications of his actions." But this claim is speculative. Tibbetts has failed to establish why a neuropharmacologist was necessary when the court already allotted him funds to hire a forensic psychiatrist and clinical psychologist. Both of these doctors could have assisted defense counsel in explaining how Tibbetts's drug use may have affected his behavior on the night of the murders. See *State v. Smith* (1991), 61 Ohio St.3d 284, 289, 574 N.E.2d 510, 515. Defense counsel therefore had alternate means of fulfilling the same functions as a neuropharmacologist. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. We cannot conclude that Tibbetts was deprived of a fair trial due to the lack of a neuropharmacologist's assistance.

{¶ 22} Tibbetts's first, third, and fourth propositions are accordingly overruled.

IV

{¶ 23} In his fifth proposition, Tibbetts claims that the trial court erred in refusing to set bail prior to trial. Citing the seriousness of the crime involved, Tibbetts's extensive criminal record, and the fact that Tibbetts was arrested in Kentucky, the trial court denied bail at Tibbetts's arraignment.

{¶ 24} Section 9, Article I of the Ohio Constitution provides: "All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great * * *." It is the trial court's role to determine whether a capital defendant should be admitted to bail. *State ex rel. Reams v. Stuart* (1933), 127 Ohio St. 314, 188 N.E. 393, syllabus.

Here, Tibbetts has failed to show how the trial court's denial of bail prejudiced him. The fact that Tibbetts was charged with two aggravated murders dictated a high amount of bail, if any. See *Bland v. Holden* (1970), 21 Ohio St.2d 238, 50 O.O.2d 477, 257 N.E.2d 397. Tibbetts was an indigent defendant and does not demonstrate how he would have been able to post any appropriate bond set by the court.

{¶ 25} Tibbetts has also failed to demonstrate how the court's failure to set bail could have reasonably affected the outcome of his trial. Although he argues that he could have made bail and assisted his counsel in preparing a defense, Tibbetts offers no reason why he could not have helped prepare a defense without bail. Further, following conviction, "any error concerning the issue of pretrial bail is moot." *State v. Patterson* (1996), 110 Ohio App.3d 264, 271, 673 N.E.2d 1001, 1006. Tibbetts should have raised his pretrial bail claim, if at all, in a habeas corpus proceeding. See *Jenkins v. Billy* (1989), 43 Ohio St.3d 84, 85, 538 N.E.2d 1045, 1046. We overrule the fifth proposition of law.

V

{¶ 26} In the fourteenth and fifteenth propositions of law, Tibbetts argues that the trial court should have suppressed certain evidence and statements that the police obtained during its investigation of the murders. In the fourteenth proposition, Tibbetts insists that the trial court should have granted his pretrial motion to suppress because police lacked probable cause to arrest him. The fifteenth proposition contends that Tibbetts did not knowingly, intelligently, and voluntarily waive his *Miranda* rights before talking to police.

*Probable Cause to Arrest*

{¶ 27} During his investigation of the murders, Cincinnati police sergeant Thomas Lanter learned that Hicks's Geo Metro automobile was missing. Further investigation by Sergeant Lanter revealed that the Covington police had impounded the vehicle shortly after the murders. Sergeant Lanter also learned that Covington police had found Tibbetts with the car. Sergeant Lanter found no indication that

Tibbetts had permission to drive Hicks's car; to the contrary, the investigation indicated that Hicks and Crawford were the only persons authorized to drive it. Based on these facts, Sergeant Lanter charged Tibbetts with receiving stolen property and obtained an arrest warrant, which led to Tibbetts's arrest.

{¶ 28} The standard for a constitutionally valid arrest is probable cause, "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Gerstein v. Pugh* (1975), 420 U.S. 103, 111-112, 95 S.Ct. 854, 862, 43 L.Ed.2d 54, 64, quoting *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145. When a warrant has been issued, as in this case, our role as a reviewing court is to determine whether the magistrate had a substantial basis for concluding that probable cause existed. See *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus. In conducting this review, we are mindful that the weight of the evidence and credibility of witnesses at the suppression hearing are issues primarily in the domain of the trier of fact. *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547. Evidence obtained as a result of an illegal arrest is inadmissible at trial. *State v. Henderson* (1990), 51 Ohio St.3d 54, 56, 554 N.E.2d 104, 106, citing *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

{¶ 29} We reject Tibbetts's contention that the Cincinnati police lacked probable cause to arrest him for receiving stolen property. Shortly after discovering the Hicks and Crawford murders, police learned that Hicks's car was missing and had reliable information that Tibbetts was not authorized to drive it. Police also knew that two Covington police officers observed Tibbetts in possession of the car shortly after midnight on November 6, 1997, the same night as the murders. Thus, before the warrant issued, police knew that Hicks was murdered, his car was missing, Tibbetts likely did not have permission to drive the car, and Tibbetts was seen with the car. Based upon the totality of these circumstances, an arrest warrant

for receiving stolen property was supported by probable cause. The fourteenth proposition of law is overruled.

*Statements Made During Police Interrogation*

{¶ 30} In the fifteenth proposition, Tibbetts argues that the trial court should have suppressed statements he made to police following his arrest for receiving stolen property. After being read his *Miranda* rights, Tibbetts signed a form waiving those rights and allowed police to question him. After police asked Tibbetts if he had seen his wife recently, Tibbetts asked to terminate the interview and the questioning ceased. Before the officers left the room, however, Tibbetts asked them, "What's the charge, manslaughter?" The trial court denied Tibbetts's motion to suppress, concluding that any statements Tibbetts gave were voluntary.

{¶ 31} It is undisputed that police questioned Tibbetts during a custodial interrogation, to which the Fifth Amendment privilege against compelled self-incrimination attaches. See *Miranda v. Arizona* (1966), 384 U.S. 436, 460-461, 86 S.Ct. 1602, 1620-1621, 16 L.Ed.2d 694, 715-716. But a statement is not "compelled" within the meaning of the Fifth Amendment if a suspect voluntarily, knowingly, and intelligently waives his privilege. *Colorado v. Spring* (1987), 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965. " 'Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " *Id.*, quoting *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421; see, also, *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854. Among the relevant circumstances to consider are " 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of any threat or inducement.' " *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208,

1226, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

{¶ 32} Tibbetts points to several factors that supposedly show lack of voluntariness. First, he emphasizes the interrogating officer's admission that Tibbetts was "groggy" at the time of questioning due to medication he had taken earlier in the day. Second, the officer knew that Tibbetts had taken a fifty-milligram dose of medication but was "not familiar" with the drug's effect on the mind or body. Finally, Tibbetts points to the pretextual nature of the interrogation. Although Tibbetts had been arrested for receiving stolen property, the interrogation was for the purpose of investigating the murders of Hicks and Crawford. We disagree with Tibbetts and find that none of these factors, either collectively or individually, undermines the conclusion that Tibbetts's post-arrest statements were voluntary.

{¶ 33} The fact that the interrogating officers sought to question Tibbetts about the murders, and not the charge for receiving stolen property, does not indicate involuntariness. The United States Supreme Court rejected such an argument in *Spring*, holding that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Spring*, 479 U.S. at 577, 107 S.Ct. at 859, 93 L.Ed.2d at 968; accord *State v. O'Neal* (2000), 87 Ohio St.3d 402, 413, 721 N.E.2d 73, 86.

{¶ 34} We also reject the claim that the medication and recent hospitalization at a psychiatric ward rendered Tibbetts's statements involuntary. The interrogating officer testified that he fully advised Tibbetts of his rights and that Tibbetts was calm and cooperative. The officer also testified that Tibbetts appeared to understand the questions asked of him and did not seem intoxicated during the questioning. The trial court's findings were consistent with this testimony and we are in no position to question them; we must defer to the trial

court's factual findings concerning voluntariness so long as the record supports them. See *State v. Keene* (1998), 81 Ohio St.3d 646, 656, 693 N.E.2d 246, 257. Moreover, there is no evidence to suggest, and Tibbetts does not allege, any physical coercion or other tactics by police designed to break his will. *Spring*, 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 965, citing *Oregon v. Elstad* (1985), 470 U.S. 298, 312, 105 S.Ct. 1285, 1295, 84 L.Ed.2d 222, 234. The interrogation was brief and ceased upon Tibbetts's request to terminate it.

{¶ 35} One of Tibbetts's utterances—his inquiry about whether the police were charging him with manslaughter—came after he had invoked his right to terminate the questioning. There is no basis, however, for suppressing even this statement. Tibbetts volunteered this inquiry after the interrogating officers told him they would leave. Hence, there was no *Miranda* violation that would warrant suppression. See *Edwards v. Arizona* (1981), 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387; *State v. Raglin* (1998), 83 Ohio St.3d 253, 262-263, 699 N.E.2d 482, 491. We reject the fifteenth proposition of law.

VI

{¶ 36} Tibbetts advances four propositions of law arguing that the trial court erroneously allowed various items of evidence to be admitted during the guilt phase. In none of these instances do we find error warranting reversal.

*Gruesome Photographs*

{¶ 37} The sixth proposition of law asserts that the prosecution admitted gruesome photographs of the victims that prejudiced the defense. The prosecution admitted seven photographs depicting Hicks's body, seven photographs of Crawford's body, and several slides derived from photographs taken by the coroner during the victims' autopsies. Tibbetts argues that the cumulative and inflammatory nature of these photographs and slides outweighed any probative evidentiary value they may have had in the case.

**{¶ 38}** "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact * * * as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. We review a trial court's decision to admit photographs under an abuse-of-discretion standard. *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 274. If the probative value of a photograph outweighs its prejudicial impact and the photograph is neither repetitive nor cumulative, we will not disturb a trial court's decision to admit it. *Id.*

**{¶ 39}** At trial, Tibbetts objected to three crime-scene photographs of Hicks's body. Exhibit 61 shows Hicks slumped in a chair with knives protruding from his chest, exhibit 64 is a close-up photograph of a knife stuck in Hicks's back, and exhibit 65 is another close-up photograph showing two knives in Hicks's chest. We find no abuse of discretion in admitting these photographs. None of the photographs shows a particularly gruesome image of Hicks. Moreover, the images are not cumulative because they each show the body from a different angle to establish that the attacker used multiple knives in multiple areas of the victim's body. None of the other crime-scene photographs showed all of the details included in exhibits 61, 64, and 65. Finally, the challenged photographs had significant probative value. The two close-up photographs of knives in Hicks's chest indicated both intent to kill and prior calculation and design. See *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d at 274 (noting that photographs of victim's injuries were probative of capital defendant's intent and deliberation).

**{¶ 40}** Tibbetts also objected to seven crime-scene photographs of Crawford. Although the trial court sustained a defense objection to one of the photographs (exhibit 78), it admitted the remaining photographs into evidence. Of the photographs admitted, four (exhibits 76, 77, 79, and 81) were decidedly

gruesome. All show Crawford on the bedroom floor with pieces of her brain lying next to her head. The photographs also show a large amount of blood, as well as the extensive damage done to Crawford's face and head. Despite the gruesome nature of these images, however, we find no abuse of discretion in the trial court's decision to admit them. The pictures graphically portray the force used to strike Crawford and were therefore indicative of intent to kill and the extent of the injuries inflicted. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 391, 659 N.E.2d 292, 304. Viewed individually or together, these photographs, though gruesome, were valuable in giving the jury an appreciation of the crime scene. *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042, 1058. We also do not consider them to be cumulative. Exhibit 76 showed Crawford in relation to her surroundings and, unlike the other photos, did not provide a clear view of the damage done to her head. And even though exhibits 77 and 79 each showed Crawford's brains lying on the floor, exhibit 79 provided a close-up view of Crawford's head that depicted the violent nature of the blows more clearly than any of the other photographs admitted. Although exhibit 81 also showed Crawford's badly beaten head, the photo had probative value independent of the other images because it showed a knife protruding from Crawford's neck.

{¶ 41} As to the remaining crime-scene photographs of Crawford challenged by the defense, we also find no abuse of discretion by the trial court. Exhibit 82 gave a close-up view of Crawford's numerous knife wounds, which could not be seen in other photographs, and exhibit 83 shows a bent knife on the floor but reveals no wounds. These photographs were probative of intent to kill and were not so gruesome as to be considered inflammatory. *Evans*, 63 Ohio St.3d at 250, 586 N.E.2d at 1058.

{¶ 42} Tibbetts also objected to the admission of four slides that were made by the coroner's office in connection with the autopsies. All four slides show Crawford's shaved head from different angles and precisely demonstrate the extent

of the injuries to Crawford's skull. We find no error in allowing the prosecution to introduce the slides as evidence. Although gruesome, the coroner's slides served a different purpose than the crime-scene photographs. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 676-677, 687 N.E.2d 1358, 1367. The deputy coroner used the slides in his testimony to explain the wounds and his conclusion that the injuries were consistent with Crawford having been struck repeatedly by a baseball bat. The deputy coroner also used the slides to identify at least seven distinct blows to Crawford's body, including at least four to the head and a blow to Crawford's arm that was likely received as she tried to defend herself. The slides were not cumulative and had probative value above and beyond that provided by the crime-scene photographs.

**{¶ 43}** We find no error in the trial court's admission of the crime-scene photographs and coroner's slides and accordingly overrule the sixth proposition of law.

*Hearsay*

**{¶ 44}** In his eleventh proposition of law, Tibbetts argues that the trial court improperly allowed hearsay testimony from witnesses Betty Hoskins, Roseann Crawford, and Geraldine Anderson. Each testified to statements made by Crawford before she was murdered. Defense counsel, however, lodged no objections to any of the challenged statements. Accordingly, we limit our review to ascertaining whether admission of any of the statements was plain error. See *State v. Johnson* (2000), 88 Ohio St.3d 95, 111, 723 N.E.2d 1054, 1069.

**{¶ 45}** Tibbetts first challenges testimony by Hoskins, who was a friend of Crawford. Hoskins testified that about one week before the murders, Crawford handed her a deed to a house she owned. According to Hoskins, Crawford asked her to give the deed to Crawford's sister "if anything happens to me," and confided to Hoskins that she was afraid of Tibbetts. We find no error in allowing this testimony.

16

**{¶ 46}** Evid.R. 801 and 802 forbid the introduction of an out-of-court statement offered to prove the truth of the matter asserted. The prohibition on hearsay is subject to a number of exceptions, including Evid.R. 803(3), which allows introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." Testimony that a victim was fearful falls under this hearsay exception and is properly admitted. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398; see, also, *State v. O'Neal*, 87 Ohio St.3d at 411-412, 721 N.E.2d at 84-85. We therefore cannot consider the admission of Hoskins's testimony to be plain error.

**{¶ 47}** Tibbetts also contends that Crawford's sister, Roseann Crawford, offered hearsay testimony. Roseann testified about a telephone conversation with her sister on the night of the murders. Roseann could hear Tibbetts arguing with Crawford as Crawford tried to talk on the telephone. Roseann testified that during the conversation, Crawford "said that she couldn't take it no more, that [Tibbetts] was upstairs doing crack, and she wanted him out." Crawford also asked Roseann for some boxes, presumably to pack up Tibbetts's things. Tibbetts argues that these statements go beyond the proper scope of any applicable hearsay exception.

**{¶ 48}** Roseann's testimony about Crawford's statements was probative of Crawford's apparent intent to separate from Tibbetts. We have held that such statements are admissible under the Evid.R. 803(3) "state of mind" exception to the hearsay rule. *O'Neal*, 87 Ohio St.3d at 411-412, 721 N.E.2d at 84-85. The state-of-mind exception, however, does not permit witnesses to testify to the declarant's statements as to *why* he or she held a particular state of mind. *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960, 967-968, citing *Apanovitch*, 33 Ohio St.3d at 21-22, 514 N.E.2d at 398; see, also, *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000, 1013. The statements about Tibbetts's use of crack cocaine are arguably beyond the scope of what is properly admitted under Evid.R. 803(3). Nevertheless, we discern no error warranting reversal because the statement about

Tibbetts being "upstairs doing crack" was harmless beyond a reasonable doubt. This testimony actually played into the defense strategy of portraying Tibbetts as a man who could not have intended to kill because of his extreme intoxication. Moreover, Crawford's statement about Tibbetts using crack merely described what Tibbetts was doing *at the time* she was talking to Roseann. The statement is fairly characterized as a present sense impression, *i.e.,* a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," and therefore admissible notwithstanding the hearsay rule. Evid.R. 803(1); see, also, *State v. Wages* (1993), 87 Ohio App.3d 780, 787-788, 623 N.E.2d 193, 198.

{¶ 49} Tibbetts's final hearsay challenge revolves around testimony from Anderson, who was Crawford's aunt and next-door neighbor. Anderson saw Tibbetts, Crawford, and Hicks at a neighborhood bar on the evening of the murders and telephoned Crawford later that night. Anderson testified that she heard Tibbetts "telling [Crawford] to take something" and that Crawford twice said, "I don't want it" before telling Anderson she would have to hang up and call back. Tibbetts argues that these statements were prejudicial because the prosecution used this conversation to help establish a motive to commit the murders. Tibbetts's challenge to these statements is meritless. The statements were innocuous and contain no assertions that the state was trying to prove. It appears from the context of this testimony that the state was trying to establish that Crawford promised to call Anderson back but never did, setting a time frame for when the murders occurred. We discern no plain error in admitting this testimony. We overrule the eleventh proposition of law.

*Surveillance Videotape*

{¶ 50} In his twelfth proposition, Tibbetts argues that the trial court erred in allowing the prosecution to admit exhibit 4A, a two-minute excerpt from a security surveillance videotape. The state used the tape to show a white Geo Metro

automobile leaving Hicks's house on the night of the murders. Tibbetts complains that the tape, which had been "dubbed and altered" from the original, should not have been allowed.

{¶ 51} Exhibit 4A was taped from exhibit 4, which was a videotape recorded by a security surveillance camera operated by a business located across the street from Hicks's home. William Deavers, the owner of the business that used the security camera, testified that exhibit 4 was the tape he used from 8:30 a.m. on November 5, 1997, until 8:30 a.m. on November 6, 1997. Deavers authenticated the original tape and also testified that exhibit 4A was an accurate copy. The state also adduced testimony from Cincinnati police officer Harry Frisby, who viewed both the original tape and the dubbed tape and testified to the accuracy of exhibit 4A. Because neither Deavers nor Frisby actually created the dubbed tape, however, Tibbetts argues that the trial court erred in admitting it. He argues that he has raised a genuine issue as to exhibit 4A's accuracy, precluding its admission. This claim is without merit.

{¶ 52} To prove the content of a recording, Evid.R. 1002 requires the original recording except as otherwise provided by statute or evidentiary rule. In turn, Evid.R. 1003 provides, "A duplicate is admissible to the same extent as an original unless (1) a genuine issue is raised as to the authenticity *of the original* or (2) in the circumstances it would be unfair to admit the duplicate *in lieu of the original*." (Emphasis added.) The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded. *Natl. City Bank v. Fleming* (1981), 2 Ohio App.3d 50, 57, 2 OBR 57, 63, 440 N.E.2d 590, 598. The decision to admit a duplicate is left to the trial court's sound discretion. See *State v. Easter* (1991), 75 Ohio App.3d 22, 27, 598 N.E.2d 845, 849.

{¶ 53} There was no abuse of discretion here. Neither of the limitations in Evid.R. 1003 applied to exhibit 4A. The defense raised no issue concerning the authenticity or accuracy of the *original* (exhibit 4) and did not object to the original

tape being admitted as evidence. Moreover, the state did not seek to introduce the duplicate videotape *in lieu of* the original. The trial court admitted *both* the duplicate (exhibit 4A) and the original (exhibit 4), allowing the jury to directly compare the two. Any objection Tibbetts may have regarding the duplicate's accuracy concerns the tape's weight and not its admissibility. Tibbetts's twelfth proposition of law is overruled.

*Other-Acts Evidence*

**{¶ 54}** In the thirteenth proposition of law, Tibbetts argues that the prosecution prejudiced his defense by introducing evidence of uncharged criminal conduct.

**{¶ 55}** Tibbetts first challenges testimony offered by Robin Amburgey, an ex-girlfriend with whom Tibbetts had had a child. Amburgey testified that Tibbetts was lax in his child support payments. She also testified that Tibbetts abused alcohol, crack, and Xanax during their relationship. Tibbetts also complains of testimony given by Sally Smith and Peggy Rowekamp, two nurses at the behavioral health unit at St. Elizabeth Hospital. Both nurses were working when Tibbetts checked himself into St. Elizabeth less than three days after the murders. Smith and Rowekamp testified that Tibbetts checked into St. Elizabeth under a false name. Rowekamp also added that Tibbetts was a "drug seeker."

**{¶ 56}** Evidence of other crimes, wrongs, or acts "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Evid.R. 404(B); see, also, Evid.R. 404(A). Evidence showing bad character may be admissible, however, for other purposes, such as proof of motive, opportunity, preparation, plan, intent, knowledge, identity, or absence of mistake, or accident. *Id.*

**{¶ 57}** Defense counsel lodged no objection to Amburgey's statements, limiting us to a plain-error review of her testimony. And although there was an objection to the challenged testimony from Smith and Rowekamp, defense counsel

objected on physician-patient privilege grounds only. There was no objection based on Evid.R. 404, the only ground raised on this appeal. Because he failed to object at trial on the specific ground raised here, Tibbetts has forfeited the issue, limiting us to a plain-error analysis. Evid.R. 103(A)(1); *State v. Mason*, 82 Ohio St.3d at 159, 694 N.E.2d at 950.

{¶ 58} We acknowledge that Amburgey's testimony about Tibbetts's failure to pay support was irrelevant and tended to portray Tibbetts in a negative light. Assuming that the testimony was improper under Evid.R. 404(B), we find no plain error warranting reversal because the testimony was harmless beyond a reasonable doubt. Amburgey's reference to a lack of child support was isolated and of minor significance given the gravity of the offenses for which Tibbetts was being tried. Cf. *State v. Gillard* (1988), 40 Ohio St.3d 226, 233, 533 N.E.2d 272, 280 (irrelevant evidence of defendant's "involvement in a mere barroom brawl cannot be seen as highly prejudicial" when defendant is accused of two aggravated murders), overruled on other grounds by *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112.

{¶ 59} We also find no error in admitting testimony from Amburgey and Rowekamp about Tibbetts's drug abuse. Evidence about Tibbetts's drug addiction was relevant to noncharacter issues and therefore allowed under Evid.R. 404(B). The state tried Tibbetts for two counts of aggravated murder committed in the course of an aggravated robbery; Tibbetts's need for drugs was probative of a possible motive to steal and kill. *State v. Henness* (1997), 79 Ohio St.3d 53, 61, 679 N.E.2d 686, 694. Even if we deemed this evidence to be improper, we would find it harmless. Tibbetts's drug addiction was a cornerstone of his defense; he cannot now complain that the state's introduction of evidence helpful to that defense rises to the level of plain error.

{¶ 60} Finally, we find no plain error in admitting Smith's testimony because evidence of Tibbetts's use of an alias was admissible under Evid.R. 404(B).

The fact that Tibbetts used an assumed name was probative of Tibbetts's consciousness of guilt. Evidence used for this purpose is admissible, as it is used for a purpose other than proving a defendant's character. See *State v. Williams* (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646, 657. We reject Tibbetts's thirteenth proposition of law.

## VII

{¶ 61} Tibbetts argues in his second proposition of law that the evidence at trial was insufficient to support his convictions. When reviewing the sufficiency of evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. We will not overturn a conviction for insufficiency of the evidence unless we find that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh* (2001), 90 Ohio St.3d 460, 484, 739 N.E.2d 749, 774.

{¶ 62} Tibbetts was convicted on three counts of aggravated murder: the purposeful killing of Hicks with prior calculation and design and the purposeful killing of Crawford and Hicks during the course of an aggravated robbery. See R.C. 2903.01(A) and (B). There is sufficient evidence to support these convictions. First, circumstantial evidence established Tibbetts's identity as the killer. Roseann Crawford telephoned the Hicks residence and spoke with Tibbetts at approximately 10:00 p.m. on the night of the murders, placing Tibbetts at the crime scene. The house also lacked any sign of forced entry. And when Tibbetts arrived at St. Elizabeth Hospital after the murders, he had a large cut on his hand and blood on his clothes. The blood on his clothes matched blood from Hicks and Crawford.

{¶ 63} There was also evidence suggesting Tibbetts's consciousness of guilt. He spoke with Amburgey at around 11:30 p.m. that night, asking her to

"[f]orgive me for what I have done." When he checked himself into St. Elizabeth Hospital two days after the murders, Tibbetts used an alias. Finally, when police questioned him after his arrest for receiving stolen property, Tibbetts blurted, "What's the charge, manslaughter?" without being asked any questions about his wife's death.

{¶ 64} Second, the state established aggravated robbery with evidence tending to show that Tibbetts stole Hicks's car on the night of the murders. Two Covington police officers testified that Tibbetts was in Hicks's Geo Metro on the night of the killings, and a serologist found Tibbetts's blood present in the driver's side of the vehicle. Two witnesses testified that Tibbetts did not have permission to drive Hicks's car. When one of the Covington police officers asked Tibbetts who owned the Geo Metro, Tibbetts lied and said it belonged to a friend in Covington. Finally, when Hicks was found dead, his right front pocket was turned inside out, suggesting that his killer may have attempted to steal from him.

{¶ 65} Third, the state introduced sufficient evidence from which the jury could infer that Tibbetts acted purposely when he killed Hicks and Crawford. The multiple stabbings of both victims and the multiple blunt force traumas inflicted upon Crawford's head were highly probative of intent to kill. The deputy coroner also added that the stab wounds he observed on both Hicks and Crawford were inflicted with intentional force. Moreover, the jury could reasonably infer prior calculation and design with respect to Hicks's murder. The multiple stab wounds closely grouped near Hicks's heart showed a deliberate effort to kill Hicks in the most efficient manner possible. The jury could have also credited the deputy coroner's testimony (and the prosecution's theory of the case) that Crawford was killed first with Hicks later attacked by surprise. If believed, this testimony supported the inference that Tibbetts killed Hicks to eliminate him as a witness before fleeing in Hicks's car. These circumstances show a calculated and deliberate

effort to kill and not merely an instantaneous deliberation. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 567-570, 687 N.E.2d 685, 706-708.

{¶ 66} Under this proposition of law, Tibbetts also contends that his convictions are against the manifest weight of the evidence. Our role in reviewing this claim is to examine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866, 882. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 547, quoting *State v. Martin* (1983) 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721.

{¶ 67} Tibbetts's defense focused on a supposed lack of criminal intent. Tibbetts maintained that he could not remember the night of the murders due to heavy drug abuse. This is not, however, the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id*. The jury could have easily rejected Tibbetts's claimed lack of memory, particularly when viewing his contention against the substantial evidence suggesting that he was not intoxicated. Tibbetts carried on separate telephone conversations with Amburgey and Roseann Crawford on the night of the murders and did not display signs of intoxication. Amburgey even noted that Tibbetts sounded "chipper." Moreover, Tibbetts did not appear intoxicated later that night when stopped by Covington police. Cf. *State v. Mitts* (1998), 81 Ohio St.3d 223, 228, 690 N.E.2d 522, 527-528 (finding that no reasonable jury could find that intoxication negated criminal intent when defendant displayed no signs of intoxication). We reject Tibbetts's manifest-weight claim. The second proposition is overruled.

VIII

{¶ 68} In his tenth proposition of law, Tibbetts argues that his trial counsel were deficient in various respects, denying him his constitutional right to the effective assistance of counsel. Before we may reverse a conviction on the grounds of ineffective assistance of counsel, we must find that (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

*Failure to Raise Issues About Competency and Sanity*

{¶ 69} Tibbetts first argues that his trial counsel should have raised an issue about Tibbetts's competency to stand trial and/or entered a plea of not guilty by reason of insanity. Tibbetts points to various factors known to his attorneys that should have raised "red flags" regarding his competency and/or his culpability. Tibbetts cites (1) the "bizarre" nature of murders, which suggested a psychologically disturbed perpetrator; (2) the fact that he was arrested at the psychiatric unit of St. Elizabeth Hospital and had a history of psychiatric problems; (3) the fact that he was taking antidepressant medication, among other drugs; (4) the testimony of a witness who found Tibbetts sleeping on a boat with a knife on the morning after the murders; (5) his inability to remember the night of the murders; and (6) his troubled childhood. If his counsel had "adequately explored" these issues, Tibbetts argues they would have challenged his competency and entered an insanity plea.

{¶ 70} A defendant is legally incompetent if "incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in

the defendant's defense." R.C. 2945.37(G). Due process principles forbid subjecting a legally incompetent criminal defendant to trial. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, 438. We do not find that counsel performed deficiently by failing to request a competency hearing. Tibbetts's competence is not drawn into question simply because he *voluntarily* sought psychiatric treatment or took psychotropic medication. Even if we were to conclude that Tibbetts was mentally ill, it does not necessarily mean that he was legally incompetent. *Id.* at syllabus. "A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 210, 502 N.E.2d 1016, 1019. Moreover, Tibbetts's trial counsel consulted with a psychologist and a psychiatrist, neither of whom found that Tibbetts lacked competence. And the record reflects no behavior by Tibbetts during trial that would suggest the lack of legal competency. Trial counsel appeared to have no reasoned basis to conclude that Tibbetts was incompetent to stand trial.

{¶ 71} We also conclude that counsel did not perform deficiently in failing to enter a plea of not guilty by reason of insanity. An insanity defense required proof that Tibbetts "did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts." R.C. 2901.01(A)(14). The defense's own psychiatric expert, Dr. Glen Weaver, examined Tibbetts on three separate occasions prior to trial and believed that Tibbetts would not have qualified for the insanity plea. We cannot find deficient performance by trial counsel in relying on their expert's opinion concerning Tibbetts's sanity, particularly since the defense would have shouldered the burden of proving insanity by a preponderance of the evidence. Trial counsel had ample basis to conclude that an insanity plea had no reasonable chance of success. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 12, 564 N.E.2d 408, 418.

*Failure to Raise Other Pretrial Issues*

26

{¶ 72} In his second claim of ineffectiveness, Tibbetts argues that his trial counsel should have challenged "the constitutionality of certain searches and seizures conducted by the Cincinnati Police Department." Although trial counsel moved to suppress Tibbetts's postarrest statements and evidence flowing from his arrest, Tibbetts insists that his trial counsel should have raised additional pretrial objections. Specifically, Tibbetts questions trial counsel's failure to challenge the legality of the police's search and seizure of (1) the Geo Metro and its contents; (2) items at the crime scene, which was also Tibbetts's home; and (3) Tibbetts's clothes, which police took from St. Elizabeth Hospital. We find no ineffective assistance because these suggested challenges were either certain to fail or unsupported by the record.

{¶ 73} Tibbetts's trial counsel had no legal basis upon which to attack the search of the Geo Metro. Tibbetts had no possessory interest in the car; the car belonged to Hicks and Tibbetts lacked permission to drive it. Tibbetts also asserts no property or possessory interest in any of the vehicle's contents. With no property or possessory interest in the vehicle, Tibbetts had no legitimate expectation of privacy in it and thus no cognizable Fourth Amendment challenge to the officers' search. *Rakas v. Illinois* (1978), 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387, 404; see, also, *State v. Otte* (1996), 74 Ohio St.3d 555, 559, 660 N.E.2d 711, 717 (citing *Rakas* for the proposition that a "car thief has no legitimate expectation of privacy in a stolen car").

{¶ 74} Any challenge to the police's search of the murder scene would have likewise failed. It appears from the record that police did not obtain a warrant to search Hicks's home (at which Tibbetts also lived) after Landwehr found Hicks dead; police responded to Landwehr's 911 call and searched the residence. A warrantless search by police is invalid unless it falls within one of the narrow and well-delineated exceptions to the Fourth Amendment's warrant requirement. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585.

There is no "murder scene exception" to the warrant requirement that would automatically validate the search in this case. *Flippo v. West Virginia* (1999), 528 U.S. 11, 14, 120 S.Ct. 7, 8, 145 L.Ed.2d 16, 20; *Mincey v. Arizona* (1978), 437 U.S. 385, 395, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290, 302. The prohibition on warrantless searches does not apply, however, when a person with common authority over the premises consents to the search. *Illinois v. Rodriguez* (1990), 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148, 156. Here, Landwehr had access to Hicks's home and called for the authorities to enter when she discovered her brother murdered. Police had ample reason to believe that Landwehr had authority to consent to a search of the home. See *id.* at 183-186, 110 S.Ct. at 2798-2800, 111 L.Ed.2d at 157-160. The search was therefore valid.

{¶ 75} To the extent that Tibbetts argues that his counsel should have objected to the scope of the search police made pursuant to Landwehr's consent, we find no deficient performance because such a challenge would have likewise been unsuccessful. Tibbetts makes no argument here that the police searched areas over which he had exclusive control. See *State v. Dennis* (1997), 79 Ohio St.3d 421, 426, 683 N.E.2d 1096, 1102 (defendant bears burden of establishing his legitimate expectation of privacy in area searched). We therefore reject Tibbetts's claim of ineffective assistance based on his counsel's failure to challenge the search of the murder scene.

{¶ 76} We also reject Tibbetts's claim that his trial counsel should have moved to suppress the items of clothing that police obtained from St. Elizabeth Hospital. The record does not disclose the circumstances surrounding the police's seizure of the clothes. "Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." *State v. Gibson* (1980), 69 Ohio App.2d 91, 95, 23 O.O.3d 130, 132-133, 430 N.E.2d 954, 957. Counsel is not *per se* ineffective for failing to file a suppression motion. *State*

*v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 64, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 325.

{¶ 77} We accordingly reject Tibbetts's claims of ineffectiveness based on a failure to file additional pretrial motions to suppress.

*Deferring Opening Statement*

{¶ 78} Tibbetts next alleges that his counsel performed deficiently by delaying an opening statement until the state completed its case-in-chief. We cannot conclude, however, that counsel's decision to defer opening statement fell below a reasonable standard of representation. Counsel may have legitimately thought that deferring opening statement was a sound tactical decision; indeed, the state may have agreed, as it objected to the defense's request to do so. We must be highly deferential to counsel's performance and will not second-guess trial strategy decisions. See *State v. Bradley*, 42 Ohio St.3d at 142-144, 538 N.E.2d at 379-381; *State v. Mason*, 82 Ohio St.3d at 157, 694 N.E.2d at 949. Moreover, Tibbetts offers nothing more than conclusory arguments about how delaying opening statement prejudiced him. We therefore reject this claim of ineffective assistance.

*Failure to Object to Prosecution's Opening Statement*

{¶ 79} In his next claim of ineffective assistance, Tibbetts argues that his trial counsel were deficient for failing to object during the prosecution's opening statement. Tibbetts first complains that his counsel should have objected to the prosecution's use of a demonstrative "timetable." However, he fails to articulate how this "timetable" prejudiced his defense. The trial court instructed the jury before the trial began that the opening statement was not evidence.

{¶ 80} Tibbetts also insists that his trial counsel should have objected to many aspects of the prosecution's opening statement. Tibbetts complains that the prosecutor talked about hearsay evidence, such as statements Crawford made to Hoskins and Roseann Crawford prior to her death. As we noted in disposing of

Tibbetts's eleventh proposition, however, these statements were admissible. We also find nothing improper about references to statements made by Tibbetts; these would be admissible in any event as party admissions under Evid.R. 801(D)(2). We cannot find counsel ineffective for failing to raise objections that would have been properly overruled.

{¶ 81} Tibbetts then complains about the prosecutor's reference to inadmissible "other act[s]." The prosecutor referred to Tibbetts's drug abuse, his failure to pay support for the child he had with Amburgey, and his use of a false name when he checked into St. Elizabeth Hospital after the murders. We reject these arguments for the same reasons we rejected Tibbetts's thirteenth proposition of law. Because the acts were either admissible or harmless error in any event, Tibbetts cannot establish ineffective assistance.

{¶ 82} We also reject Tibbetts's claim that counsel should have objected to the prosecution's reference to Roseann Crawford having a "cold chill" on the night of the murders that caused her to try and call her sister. We fail to see how this remark could be prejudicial when it does not suggest Tibbetts's identity as the killer.

*Prosecutorial Misconduct*

{¶ 83} Tibbetts also argues that his trial counsel should have objected to various instances of prosecutorial misconduct. Tibbetts first cites an instance when the prosecutor said, while offering an exhibit into evidence, "These gloves do fit, contrary to another trial, Judge." But this was an isolated remark that defense counsel may have reasonably decided to ignore rather than call the jury's attention to it. Counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection. *State v. Brown* (1988), 38 Ohio St.3d 305, 319, 528 N.E.2d 523, 539-540.

{¶ 84} Tibbetts also argues that the state's closing argument was fraught with prosecutorial misconduct. Tibbetts complains of "inflammatory name calling"

30

by the prosecutor that served only to "inflame the jury." For example, the prosecutor noted, "It's almost like a trained killer the way he took out Fred Hicks." And when talking about Crawford's murder, the prosecutor stated, "[W]hen you do what the defendant did, and you take a baseball bat, and knock someone's brain clear out of their head, and you stab them, dozens of times, that's intentional." During rebuttal, the prosecutor talked again about Crawford's injuries and speculated about her postmortem injuries by noting, "[A]fter you beat somebody, if you have a gun, you blast them in the head. That's what the mafia, I think, do. Make sure that final shot is towards the back of the head so there is no doubt that they are dead." Later in the argument, the prosecutor referred to Tibbetts as "nothing but a coward" for the way he killed Crawford.

{¶ 85} We assess prosecutorial misconduct in closing arguments by asking " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, 1254, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. While a prosecutor may not make excessively emotional arguments tending to inflame the jury's sensibilities, the prosecutor is entitled to some latitude in making a closing argument to the jury. "Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." *State v. Keenan* (1993), 66 Ohio St.3d 402, 409, 613 N.E.2d 203, 209. Even if trial counsel had objected here, none of the challenged statements would warrant reversal.

{¶ 86} Most, if not all, of the prosecutor's comments here were aimed at describing the purposeful and brutal nature of Tibbetts's acts. The prosecutor used the "coward" description to highlight his theory that Tibbetts could not even face Crawford as he killed her, striking her in the back of the head with the baseball bat. And the "trained killer" remark was a reasonable description of how Hicks's wounds appeared. Contrary to Tibbetts's assertions, these remarks were not

"inflammatory name calling"; rather, they appear to be fair comment on the evidence presented at trial. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 451, 696 N.E.2d 1009, 1021. Finding no meritorious basis for any objections to these comments, we cannot say that trial counsel was ineffective for failing to raise any.

{¶ 87} We acknowledge that Tibbetts's counsel could have reasonably objected to the prosecutor's reference to the "mafia" in describing Tibbetts's murderous acts. There was no evidence at trial suggesting that Tibbetts was involved in organized crime. Nevertheless, assuming *arguendo* that defense counsel should have objected, we ascertain no prejudice from the remark. The reference was isolated and came in the context of explaining why Tibbetts stabbed Crawford repeatedly after she was already dead. We cannot conclude that this one remark denied Tibbetts a fair trial.

{¶ 88} Tibbetts also complains about other aspects of the prosecutor's closing argument that he considers unfair comment on the evidence. He first describes the "nebulous connection" the prosecution tried to make between Tibbetts's plan to divorce Crawford and a plan to kill her. The prosecutor argued:

"[W]ithin days * * * of the marriage of this defendant to Sue Crawford, he was already planning an annulment. Within days.

"Prior calculation and design. He's already thinking of getting rid of her. Now, I'll agree we're not talking about murder at that point in time. We're talking about getting rid of her in a divorce and annulment setting. But the thought's already there. I'm in here, and now I'm going to get rid of her."

{¶ 89} The prosecutor then continued to say that Crawford caught Tibbetts using drugs she did not like, such as crack cocaine, and that Tibbetts's reaction was to formulate a plan to kill her. Tibbetts complains that his counsel's failure to object prejudiced him further because Tibbetts interrupted the argument to dispute the prosecutor's characterization of the evidence.

**{¶ 90}** We see nothing wrong with these statements, as they constitute fair commentary on the evidence. Prosecutors are entitled to some latitude in arguing what the evidence has shown and what the jury may infer from the evidence. *State v. Smith*, *supra*, 80 Ohio St.3d at 111, 684 N.E.2d at 689. Moreover, even if we were to find counsel deficient for failing to object to these statements, we would be unable to find prejudice. The prosecution's comments were designed to show that Tibbetts acted with prior calculation and design when he murdered Crawford. The jury, however, did *not* find Tibbetts guilty of aggravated murder with prior calculation and design as charged in count one of the indictment; as to that count, the jury instead found him guilty of the lesser included offense of murder. Accordingly, we cannot find ineffective assistance of counsel based on a failure to object to these parts of the prosecution's closing argument.

**{¶ 91}** Finally, Tibbetts complains of prosecutorial misconduct during the penalty phase of the case. During the penalty-phase closing argument, the prosecutor urged the jury to reject any notion that Tibbetts's drug abuse on the day of the murders was extraordinary. The prosecutor called Tibbetts a "con man" and argued, "The only thing out of the ordinary that night is that Sue finally told him, Ray, it's time to hit the road, I've had it." Defense counsel did not object, and Tibbetts caused yet another disturbance, leading to his removal from the courtroom. While Tibbetts was being led away, the prosecutor added, "This is [*sic*] the final acts of Ray Tibbetts * * * he's going to show you, ladies and gentlemen." Tibbetts argues that these comments were uncalled for and that his counsel should have objected.

**{¶ 92}** We find no ineffective assistance of counsel. Tibbetts's counsel did, in fact, object to the prosecutor's reference to Tibbetts's "final acts." And after Tibbetts was led from the courtroom, the trial court specifically instructed the jury to disregard the outburst, even though Tibbetts was not entitled to an instruction for the jury to disregard his own behavior. See *State v. Bey* (1999), 85 Ohio St.3d 487,

500-501, 709 N.E.2d 484, 498. Thus, Tibbetts received a curative instruction (albeit one to which he was largely not entitled), which we presume the jury followed. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100. Moreover, the prosecutor's comment that Crawford wanted Tibbetts to "hit the road" was not improper. The prosecution was calling the jury's attention to Tibbetts's possible motive, which was a legitimate rebuttal to the defense's mitigation argument that the murders resulted from Tibbetts's substance abuse and consequent inability to refrain from criminal activity.

{¶ 93} We find no merit to any of Tibbetts's arguments and therefore reject his claims of ineffective assistance based on counsel's failure to object to prosecutorial misconduct.

*Failure to Raise Objections During Jury Deliberations*

{¶ 94} In his final claim of ineffective assistance, Tibbetts argues that his counsel failed to properly protect his rights during jury deliberations. At one point, the jury requested the toxicology reports of Tibbetts, Hicks, and Crawford. The request further specified, "If no toxicology screen please provide testimony and/or [Tibbetts's] testimony." Because there were no exhibits showing toxicology reports, the trial court ordered the court reporter to read toxicology testimony to the jury. He did not, however, order any of Tibbetts's testimony read to the jury, and defense counsel did not object. Tibbetts argues that this constituted ineffective assistance. We disagree.

{¶ 95} When the trial judge read the jury's question, he interpreted it to mean that the jury wanted "any exhibits or testimony regarding the drug screen toxicology of the defendant, Raymond Tibbetts, Judith Sue Crawford, and Fred Hicks." Because there were no toxicology exhibits for any of the three and no toxicology testimony about Tibbetts, the trial court ordered the court reporter to read testimony to the jury about the toxicology screens done on Crawford and Hicks. Tibbetts makes no argument about how the failure to read his testimony in

this situation prejudiced him. The jury specifically asked for testimony *about toxicology screens*. Because Tibbetts did not testify on this subject, there was no testimony by Tibbetts to read back to the jury.

{¶ 96} Finally, Tibbetts argues that his counsel should have objected later in deliberations when the jury sent another note to the trial judge. The note requested specific portions of testimony from Tibbetts and Roseann Crawford.[2] After discussing this communication with counsel, the trial court concluded, "It's difficult to attempt to reasonably respond at this point to your requests. Therefore, at this point I'm going to ask you to rely upon your collective memories to answer your requests, as best that you can."

{¶ 97} Defense counsel offered no objection to the trial court's refusal to read the requested testimony. Quite to the contrary, the record implies that defense counsel acquiesced in the trial court's action. We find no ineffective assistance in this regard because defense counsel had legitimate tactical reasons not to object. Roseann Crawford's testimony was damaging to Tibbetts, as it tended to establish that her sister and Tibbetts were having marital problems and that Crawford wanted Tibbetts out of the house. Crawford's testimony, which described her phone conversation with Tibbetts on the night of the murders, also placed Tibbetts at the murder scene. Defense counsel may have likewise decided that Tibbetts's testimony could hurt, and not help, his client's case during the jury's deliberations. We can find no basis to second-guess trial counsel in this situation and thus reject this claim of ineffective assistance.

---

2. The jury's note to the trial court read:
    "Judge Dinkelacker:
    "Please provide testimony from Mr. Tibbetts regarding his being on the third floor of 228 Mohawk.
    "Also please provide testimony from Mr. Tibbetts regarding:
    ">his history of fighting with Crawford
    "Also, Roseanne's [*sic*] testimony regarding the phone call between Tibbetts and herself on or about Nov. 5, 1997 *and* Roseanne's [*sic*] phone call (conversation) with Crawford."
(Emphasis *sic*.)

**{¶ 98}** We find no merit to any of Tibbetts's claims of ineffective assistance of counsel and accordingly overrule the tenth proposition of law.

IX

**{¶ 99}** Having rejected each of Tibbetts's propositions of law, we now turn to our statutory duty to independently weigh the aggravating circumstances against the mitigating factors and to determine whether Tibbetts's sentence is disproportionate to sentences in similar cases. R.C. 2929.05(A). Our review at this stage focuses on the sentence for Hicks's murder, as that was the only offense for which Tibbetts was sentenced to death. See *id.*

**{¶ 100}** We begin by considering whether the evidence supports a finding of the aggravating circumstances of which Tibbetts was convicted. *State v. Treesh*, *supra*, 90 Ohio St.3d at 491, 739 N.E.2d at 779. The jury found Tibbetts guilty of two aggravating circumstances: (1) a course of conduct involving the purposeful killing of two or more persons by the offender, R.C. 2929.04(A)(5); and (2) a murder committed while the principal offender in an aggravated robbery, R.C. 2929.04(A)(7). Our independent assessment convinces us that the state proved the existence of these aggravating circumstances beyond a reasonable doubt. We also merge these aggravating specifications in our independent review for purposes of determining whether they outweigh the mitigating factors beyond a reasonable doubt. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 231-232, 690 N.E.2d 522, 529-530; *State v. Garner* (1995), 74 Ohio St.3d 49, 53-55, 656 N.E.2d 623, 630-631.

**{¶ 101}** Against the merged aggravating circumstances, we weigh the nature and circumstances of the crime; the history, background, and character of the offender; and any applicable mitigating factors enumerated in R.C. 2929.04(B)(1) through (B)(7). *Treesh*, 90 Ohio St.3d at 491, 739 N.E.2d at 779. The nature and circumstances of the crime offer little mitigating value. Tibbetts abused drugs and argued with Crawford on the day of the murders. Crawford yelled at Tibbetts about his crack cocaine habit. Rather than walk away from the

36

confrontation with his wife, Tibbetts brutally beat her with a baseball bat and then stabbed her several times. He then went downstairs and repeatedly stabbed the sixty-seven-year-old Hicks, who was connected to an oxygen tank and defenseless.

{¶ 102} The defense presented evidence about Tibbetts's background, which offers some modest mitigating value. Dr. Weaver described Tibbetts's childhood as "miserable" and "horrible." Because Tibbetts's parents were drug users, Tibbetts and his siblings were placed in foster care at an early age. Tibbetts spent most of his childhood living in either a foster home or an orphanage. Tibbetts eventually achieved some success in high school as a member of the football team, but suffered a knee injury that ended his high school football career. At an early age, however, he began a pattern of getting into trouble with the authorities and eventually spent time in prison.

{¶ 103} Tibbetts offered mitigation evidence related to R.C. 2929.04(B)(3), which allows the sentencer to consider "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Tibbetts consistently claimed no memory of having murdered Crawford and Hicks. Dr. Weaver explained this lack of memory in his penalty-phase testimony that Tibbetts likely suffered from a dissociative reaction occasioned by drug abuse. According to Dr. Weaver, Tibbetts lacked capacity to refrain from engaging in criminal acts at the time he committed them. Dr. Weaver testified that Tibbetts had "limited personality resources or a personality control," which prevented him from controlling his actions. Because of this condition, Dr. Weaver explained that Tibbetts was "hooked" on a combination of drugs and alcohol and was unable to refrain from indulging in them. Dr. Weaver also testified that Tibbetts could barely control his violent impulses and was an "explosion waiting to happen" when his condition was combined with drug and alcohol use.

**{¶ 104}** Despite Dr. Weaver's testimony, we cannot conclude that Tibbetts established the existence of the R.C. 2929.04(B)(3) mitigating factor. The circumstances of the crime negate Tibbetts's claim that he lacked substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of law. Tibbetts's flight from the murder scene and his use of a false name at St. Elizabeth Hospital suggest a consciousness of his criminal culpability. Further, the testimony from Roseann Crawford, Amburgey, and two Covington police officers showed that Hicks carried on coherent conversations and did not seem intoxicated within a short time after the killings. And although Tibbetts had spent time in psychiatric care before the murders, there is little to suggest that his problems reflected the type of mental disease or defect that would have prevented him from appreciating the criminality of his conduct or refraining from killing Crawford and Hicks. Tibbetts never displayed any overt paranoia or brain damage. Moreover, Dr. Robert Tureen, a psychologist who also examined Tibbetts, concluded that Tibbetts's mental problems "are not considered of sufficient gravity that they would impair functioning on a day-to-day basis, except in circumstances in which high degrees of concentration are required for extended periods." Finally, Dr. Weaver's contention that Tibbetts was entirely unable to control his drug abuse was belied by the fact that Tibbetts once completed a rehabilitation program and remained employed and drug-free until his industrial injury in 1996.

**{¶ 105}** The mitigating factors enumerated at R.C. 2929.04(B)(1) (inducement by victim), (B)(2) (duress, coercion, strong provocation), (B)(4) (youth of offender), (B)(5) (offender's lack of significant criminal history), and (B)(6) (accused not being principal offender) do not apply to this case.[3] The defense produced evidence, however, applicable to R.C. 2929.04(B)(7), which

---

3. At least two of these statutory mitigating factors were arguably applicable to the Crawford murder. Because Tibbetts was not sentenced to death for murdering Crawford, however, we have no duty to assess their applicability to that crime.

38

instructs the jury to consider "[a]ny other factors" relevant to mitigation. In addition to the evidence about his childhood background, there was evidence that Tibbetts completed a drug and alcohol rehabilitation program during the 1990s and found steady employment as a welder for a barge company in the Cincinnati area. After injuring his knee in an industrial accident, however, Tibbetts became unable to work and ultimately began abusing pain killers and other drugs. He became depressed due to his inability to work, eventually suffered psychological problems, and was twice hospitalized at St. Elizabeth Hospital. Just two months before the murders, Tibbetts suffered a psychotic episode during which he was suicidal and hallucinated. Dr. Tureen noted that Tibbetts has a "great distaste for himself" and has few "coping skills" to help him deal with his problems. Tibbetts also expressed love for the son he had with Amburgey and the daughter he had with Crawford. He also expressed regret for his drug addiction and, despite not remembering the crime, was sorry if he killed Crawford and Hicks.

**{¶ 106}** We assign some weight in mitigation to Tibbetts's troubled childhood and family background. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 692 N.E.2d 151, 166. We also assign modest weight to Tibbetts's unquestioned drug abuse. Although voluntary intoxication is not a strong mitigating factor, see *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931, we have accorded some weight to drug addiction in mitigation. *Treesh*, 90 Ohio St.3d at 493, 739 N.E.2d at 781. Tibbetts also expressed remorse in his unsworn statement, and that remorse is entitled to some mitigation weight. *State v. Mitts*, 81 Ohio St.3d at 236-237, 690 N.E.2d at 533. We also assign some weight to the fact that Tibbetts was able to maintain gainful employment before the 1996 accident that rendered him unable to work. See *State v. Madrigal*, *supra*, 87 Ohio St.3d at 400, 721 N.E.2d at 72. Nevertheless, the collective weight of these mitigating factors is little compared to the aggravating circumstances of Hicks's

murder. We agree with the jury and the trial court that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 107} We also find that the death sentence in this case is appropriate and proportionate when compared with similar capital cases in which the death penalty has been imposed. This court has affirmed death sentences in numerous cases where the defendant engaged in a course of conduct involving the murders of two or more victims. See, *e.g.*, *State v. Hessler*, *supra*, 90 Ohio St.3d 108, 734 N.E.2d 1237; *State v. Awkal*, *supra*, 76 Ohio St.3d 324, 667 N.E.2d 960; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483. The sentence is also proportional when compared to capital cases involving felony-murder and similar mitigating circumstances. See, *e.g.*, *State v. Stallings* (2000), 89 Ohio St.3d 280, 731 N.E.2d 159 (influenced by drugs; suffering from attention-deficit/hyperactivity disorder); *State v. Baston* (1999), 85 Ohio St.3d 418, 709 N.E.2d 128 (poor childhood, remorse for murder); *State v. Sheppard* (1998), 84 Ohio St.3d 230, 703 N.E.2d 286 (paranoid schizophrenia); *State v. Benge* (1996), 75 Ohio St.3d 136, 661 N.E.2d 1019 (troubled upbringing, dependent personality, and drug addiction); *State v. Kinley* (1995), 72 Ohio St.3d 491, 498, 651 N.E.2d 419, 425 ("personality disorder with paranoid antisocial and explosive features"). The mitigating factors present here do not convince us that Tibbetts's death sentence is disproportionate or excessive.

{¶ 108} For the foregoing reasons, we affirm the convictions and death sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs separately.

————————————

**PFEIFER, J., concurring.**

{¶ 109} I concur in the court's decision to affirm Tibbetts's convictions. I also concur in the court's decision to affirm the death sentence with respect to the R.C. 2929.04(A)(5) death specification because Tibbetts was the principal offender in a course of conduct involving the purposeful killing of two or more persons.

{¶ 110} In mitigation, Tibbetts presented evidence of a psychotic episode, dissociative behavior, multiple substance abuse, and depression. None of this evidence rises to the level of a "severe mental illness." See *State v. Scott* (2001), 92 Ohio St.3d at 10-12, 748 N.E.2d at ___ (Pfeifer, J., dissenting). Accordingly, at this time, neither the sentence of death nor the execution of Tibbetts is prohibited by Section 9, Article I of the Ohio Constitution. *Id.*

---

APPENDIX

{¶ 111} *Proposition of Law No. I:* The defendant-appellant was prejudiced by a lack of funds to adequately defend himself in this litigation. As a result, Tibbetts was deprived of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 112} *Proposition of Law No. II:* The judgment of conviction on the aggravated murder counts is unsupported by legally sufficient evidence and is contrary to the manifest weight of the evidence, and as a result, appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.

{¶ 113} *Proposition of Law No. III:* The trial court failed to provide appellant Tibbetts with an independent expert pathologist to assist appellant in both the innocence/guilt and mitigation phases of his capital trial.

{¶ 114} *Proposition of Law No. IV:* The trial court's failure to appoint an independent neuropharmacologist deprived appellant Tibbetts of his statutory rights as well as his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 115} *Proposition of Law No. V:* Appellant was denied reasonable bond in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 9, of the Ohio Constitution.

{¶ 116} *Proposition of Law No. VI:* The admission of gruesome and otherwise prejudicial photographs which were cumulative of each other as well as other evidence violated appellant Tibbetts' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 117} *Proposition of Law No. VII:* Requiring that mitigating factors be proven by a preponderance of the evidence violates the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

{¶ 118} *Proposition of Law No. VIII:* The trial court's application of Ohio's statutory definition of reasonable doubt in the mitigation phase of appellant's capital trial deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 119} *Proposition of Law No. IX:* Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10, and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Raymond Tibbetts.

{¶ 120} *Proposition of Law No. X:* A defendant is denied effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I, of the Ohio Constitution, when defense counsel fails to raise the issue of defendant's competency and enter a plea of not guilty by reason of insanity, when defendant has no recollection of the alleged crime, is arrested in a psychiatric unit

of a hospital, has a history of mental illness, and a plea of not guilty by reason of insanity offered the most reasonable defense to the charges, and when defense counsel further failed to raise proper objections at trial.

{¶ 121} *Proposition of Law No. XI:* A defendant is prejudiced when the trial court admits improper hearsay evidence, depriving the defendant of a fair trial as guaranteed by the federal and state constitutions, when the improper evidence goes to a necessary element of the prosecution's case, and were hearsay statements allegedly made by the deceased victim.

{¶ 122} *Proposition of Law No. XII:* A defendant suffers prejudice when the trial court admits an inculpatory duplicate of an altered videotape which is never properly authenticated and to which there was no evidence presented regarding the process involved in the alteration of the videotape, and such evidence is introduced to prove the content of the videotape.

{¶ 123} *Proposition of Law No. XIII:* A defendant is denied his right to a fair trial when the trial court allows the state to introduce evidence of "other acts" claimed to have been committed by defendant.

{¶ 124} *Proposition of Law No. XIV:* A criminal defendant is prejudiced when his motion to suppress evidence is overruled despite the state's failure to demonstrate that the arrest of defendant was lawful and based upon probable cause.

{¶ 125} *Proposition of Law No. XV:* Unless the state demonstrates that a criminal defendant knowingly and voluntarily waived his rights and that the totality of the circumstances indicate[s] that statements were made voluntarily, the defendant's motion to suppress must be granted.

---

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*Faulkner & Tepe, LLP,* and *A. Norman Aubin*; and *Bryan R. Perkins,* for appellant.