OPINION
Plaintiffs-appellants Alecia Adkins and Calvin Adkins appeal from the August 16, 2001, and September 6, 2001, entries of the Delaware County Court of Common Pleas memorializing a jury verdict in favor of defendants-appellees following a medical malpractice trial.
 STATEMENT OF THE FACTS AND CASE
Appellant Alecia Adkins and appellant Calvin Adkins (hereinafter referred to as "appellant") are husband and wife. On June 5, 1999, at approximately 6:00 a.m., Alecia Adkins contacted appellee Dr. Alice Frazier's office after discovering that her husband had a high fever. While waiting for Dr. Frazier to return her call, Alecia Adkins gave appellant Tylenol with milk. While drinking the milk, appellant dribbled some down his chin and onto the front of his shirt. According to Alecia Adkins, when appellant spoke, "[h]e sounded like he had come from the dentist." Trial Transcript at 248.
At trial, Dr. Frazier testified that when she returned the call at approximately 6:15 a.m., Alecia Adkins told her that appellant had a fever of 105.9 and that he had fallen and could not get up. Dr. Frazier further testified that Alecia Adkins may have told her that appellant had dribbled milk. While Alecia Adkins testified that Dr. Frazier indicated that appellant might be having a stroke, Dr. Frazier, testified that she had no recollection of such a statement. Dr. Frazier then advised Alecia Adkins to take her husband to the emergency room as soon as possible.
At approximately 7:25 a.m., appellant, who was driven to the hospital by his wife, arrived at Grady Hospital where he was evaluated by appellee Dr. Ann Haynes, an emergency room doctor, at approximately 8:00 a.m. During her examination of appellant, Dr. Haynes did not find any left-sided weakness or slurred speech, although she did observe a very slight left facial droop. As part of her examination, Dr. Haynes ordered a Cat scan of appellant's head and a chest x-ray. While the chest x-ray revealed that appellant had pneumonia, the Cat scan[1] was "essentially normal". Trial Transcript at 220.After receiving the results of the Cat scan and the chest x-ray, Dr. Haynes spoke with Dr. Frazier and "told her that he [appellant] had pneumonia for sure. He was probably having a stroke". Trial Transcript at 221. Both doctors agreed that appellant should be admitted to the hospital and treated for pneumonia. At approximately 3:45 p.m., after receiving a telephone call from a nurse informing her that appellant could not move his left arm or leg, Dr. Frazier had a neurologist called. After examining appellant that evening after 8:00 p.m., Dr. Kellum, a neurologist, told appellant that he had suffered a stroke.
Subsequently, on November 3, 1999, appellant and his wife, Alecia Adkins, filed a complaint for medical malpractice against both Dr. Haynes and Dr. Frazier and their respective employers, Premier Healthcare Services, Inc. and Sunbury Family Practice, Inc. Grady Memorial Hospital was also named as a defendant in the complaint. After appellees filed timely answers, a jury trial commenced on July 31, 2001. Throughout the trial, appellant and his wife argued that appellant had suffered a thrombotic stroke on June 5, 1999, and that Dr. Haynes and Dr. Frazier were negligent in not treating appellant with TPA[2], a clot dissolving drug.
As the trial progressed, the experts agreed that appellant's stroke was caused by an occluded right carotid artery and that TPA is designed to dissolve blood clots which cause such occlusions. Thus, the issue for the jury to determine was whether Dr. Haynes and Dr. Frazier were negligent in failing to administer TPA to appellant. However, during the testimony of Dr. Conomy, appellee Dr. Haynes' expert, a problem arose. During his deposition testimony, Dr. Conomy, who is a neurologist, had testified that the cause of appellant's stroke was an occlusion of the right carotid artery. However, at trial, Dr. Conomy testified that appellant's stroke was caused by a lacunar infarct, which is a hole in the brain, rather than the occlusion of his right carotid artery. Trial Transcript at 441-444. TPA, which is a clot dissolving agent, is not effective in cases involving lacunar infarcts, which are not clots. Trial Transcript at 444. The following testimony was adduced at trial when Dr. Conomy was asked during cross-examination whether he agreed that the cause of appellant's stroke on June 5, 1999, was the occlusion of the right internal carotid artery:
 A. No, I don't agree. I said he had an occluded right internal carotid artery and a lacunar stroke. What I'm certain about is the lacunar stroke, because it appears on an imaging study. The lacunar stroke is not, in general, a consequence of carotid artery occlusion. Now, one can have both an occluded carotid artery and a lacunar stroke, and he's got both.
 Q. When you were under oath and I took your deposition —
A. Uh-huh
 Q. — Didn't you tell me that the cause of his stroke was quote, "Occlusion of the right carotid artery"?
 A. You know, I may have, but that's before I caught on to Dr. Parry's report here and reviewed it again. The truth of the matter is that's what the report says. He has had a lacunar stroke and right internal carotid artery occlusion.
 Q. You had those records to review before I took your deposition; right?
 A. Well, I didn't pick up on that. I did now and that's what he said.
Q. Today you are giving a different opinion as to cause?
 A. I'm giving a different opinion, Mr. Maloon, based on the facts.
Trial Transcript at 451-452.
On the morning following Dr. Conomy's testimony, appellants orally moved the trial court for a mistrial, arguing that they were surprised and prejudiced since "Dr. Conomy yesterday totally changed his testimony from his discovery deposition with regard to the cause of Mr. Adkins' stroke". Trial Transcript at 491. Appellants pointed out to the trial court that their entire case was based on the assumption that appellant's stroke was caused by an occlusion of the right carotid artery, which is sometimes treatable with TPA, rather than by a lacunar infarct, which is not. While counsel for Dr. Haynes and Premier Healthcare admitted to the trial court that he knew ten minutes before Dr. Conomy's testimony that Dr. Conomy was going to change the same, he argued that "[t]his issue about a lacunar stroke makes no difference. . . . Trial Transcript at 499.
After hearing the arguments of counsel, the trial court denied appellants' motion for a mistrial. The trial court found that the defense had a duty to inform appellants' counsel about the change in Dr. Conomy's testimony and that appellants were prejudiced by the same. However, the trial court further held that Dr. Conomy's surprise testimony was not so prejudicial as to effect the outcome of the trial. In so holding, the trial court stated as follows:
 . . . So the question for the court is, is it prejudicial to such a degree that it impacted the outcome of the trial? And the court is not convinced it is. And when I reviewed the totality of the testimony, I reviewed Dr. Conomy's testimony; the court is not convinced that it is so prejudicial that it would impact the outcome of the trial. And, therefore, the court will give that instruction to the jury.
 In reviewing, of course, Dr. Conomy's testimony, he did say whether it was this or this, that TPA was not indicated. So, the court will give the instruction and deny the motion.
Trial Transcript at 506. At the request of counsel for Dr. Haynes and Premier Healthcare, the trial court then instructed the jury to "ignore any testimony, delete from your memory banks any testimony of Dr. Conomy regarding lacunar infarct as a cause of Mr. Adkins' paralysis". Trial Transcript at 507.
At the conclusion of the evidence and the end of deliberations, the jury, on August 3, 2001, found in favor of appellees and against appellants. The jury's verdict was memorialized in a Judgment Entry filed on August 16, 2001. However, the judgment did not become final until Grady Memorial Hospital was voluntarily dismissed with prejudice via an entry filed on September 6, 2001.
It is from the August 16, 2001, and September 6, 2001, entries that appellants now prosecute their appeal, raising the sole assignment of error:
 THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFFS-APPELLANTS IN FAILING TO GRANT THEIR MOTION FOR A MISTRIAL.
 I
Appellants, in their sole assignment of error, argue that the trial court erred in denying their motion for a mistrial, which was made after Dr. Conomy's surprise testimony that the cause of appellant's stroke was a lacunar infarct rather than occlusion of the right carotid artery. Appellants specifically contend that they were entitled to a mistrial since Dr. Conomy, a defense expert, testified "as to a previously undisclosed opinion regarding proximate cause that renders the issue of negligence moot".
The decision whether to grant a mistrial is one addressed to the sound discretion of the trial court. Quellos v. Quellos (1994),96 Ohio App.3d 31, 41. This court may not substitute its judgment for that of the trial court absent an abuse of discretion. Id. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217. A mistrial should only be granted where the party seeking the same demonstrates that he or she suffered material prejudice so that a fair trial is no longer possible.State v. Franklin (1991), 62 Ohio St.3d 118, 127.
As is stated above, appellants orally moved for a mistrial the morning after Dr. Conomy testified that appellant's stroke was caused by a lacunar infarct, which is not treatable by TPA. Appellants, in support of their oral motion for a mistrial, argued, in part, as follows:
 MR. MALOON: At this time on behalf of the plaintiffs, I move for a mistrial. The basis is the shocking surprise testimony yesterday of defense expert witness John Conomy. Dr. Conomy yesterday totally changed his testimony from his discovery deposition with regard to the cause of Mr. Adkins' stroke. . . .
 I took his deposition 60 days ago, got his expert opinions. He comes into court yesterday, totally changes them. The law is clear. The defense has a duty to advise plaintiffs, opposing counsel, of changes in expert opinions prior to trial. This has been the law, I know, since the mid 80's.
 I think the first Supreme Court case was Huffman versus Hair Surgeon, a famous med mal case. And I believe there are three cases that followed from that from the Ohio Supreme Court, all saying the same thing: Surprise testimony is wrong. If your expert, your witness, changes his opinions prior to trial, you have a duty to notify the other side. That was clearly not done in this case. It was never done. We had no notice at all of his change in his opinion. If they had been minor changes, it might be a different story. These are changes that go to the heart of the case, and, as I say, just were totally contrary to the opinions he had given in discovery. You can't do that.
 Secondly, the opinion that Dr. Conomy gave yesterday in his attempt to establish that the giving of TPA, which is the whole issue in this case, the main issue, wouldn't have made any difference because giving TPA would not have cured what he thought — what he now thinks is the real cause of Mr. Adkins' paralysis, that is, a lacunar, l-a-c-u-n-a-r infarct in the pons, p-o-n-s of the brain. . . .
Trial Transcript at 491-492.
Upon our review of the record, we find that the trial court did not abuse its discretion in denying appellants' motion for a mistrial since such decision was not arbitrary, unconscionable or unreasonable. While Dr. Conomy's testimony at trial may have been a surprise, we agree with the trial court that such testimony, in light of the totality of the testimony[3], was not so prejudicial as to impact the outcome of the trial.
At trial, testimony was adduced that TPA, which is administered intravenously, is not a completely safe medication and is not appropriate for all stroke victims. Dr. Leon Prockop[4], appellants' own expert, testified that "about six percent or six and a half percent of the people have a hemorrhage in the brain associated with the use of TPA. So it's not a completely safe medicine. It's a strong medicine". Videotaped Deposition of Dr. Prockop at 40. Certain criteria, known as the NINDS criteria, have been established for the administration of TPA. According to such criteria, before TPA is administered to a stroke patient, the patient must be at least 18 years old, must have a clinical diagnosis of ischemic stroke, must have a measurable neurologic deficit and the time of onset of the stroke must be three hours or less. Trial Transcript at 222. In addition, a Cat scan of the patient's brain cannot show any bleeding. Id. Because of the strict criteria for administration of TPA, only around 40 or 50 people out of 1,000 are candidates for the administration of TPA. Trial Transcript at 424. Testimony was adduced at trial that out of 40 candidates for administration of TPA, only six or seven would benefit from administration of the same. Trial Transcript at 427.
While Dr. Conomy admitted to changing his opinion as to the cause of appellant's stroke between the time of his discovery deposition and his trial testimony, we find that Dr. Conomy's surprise testimony was not so prejudicial as to effect the outcome of appellant's trial. At trial Dr. Conomy, in contradiction to his deposition testimony, testified that appellant's stroke was caused by a lacunar infarction, which is not treatable by TPA, rather than an occluded carotid artery. However, when asked during redirect examination whether the administration of TPA to appellant would have been appropriate regardless of whether or notappellant had a lacunar stroke, Dr. Conomy responded in the negative. Trial Transcript at 466. Dr. Conomy also testified at trial that appellant did not meet the specific inclusion criteria respecting time of onset. As is stated above, one of the criteria for the administration of TPA is that the onset of the stroke must be three hours or less. The following is an excerpt from Dr. Conomy's trial testimony:
 Q. Now, you are in the emergency room with Mr. Adkins at 8:00 in the morning on June 5, of 1999. Did he meet, in your opinion, the specific inclusion criteria respecting time of onset?
 A. Let me move back one step. Before you get to the specific inclusion criteria, there has to be the application of common, clinical sense and judgment. The answer to your question is no. And the answer is no, because I'm not sure just when this started, and I don't want to guess. One of the rules in using this is, if you have to guess, don't use it. If you have to guess, did this happen at 5:00 or 6:00 or 6:15 or 5:20 or 7:02, launch it, because if you have to guess, that leaves everything else open to guess as well. So based on timing, there's a problem here. There are other people in the world who would have said, gee, well, I'll just buy this 6:25 number, or whatever it is, to kind of squeeze him in under the gun. I have seen it done. I wouldn't do it.
 The other thing is more fundamental. He is sick. Is he too sick? Now under N.I.H. criteria, those things were done by people that I know and are friends of mine. By the time people got to them to make criteria, a lot of people were screened out. You will not find small children, pregnant women in labor, people with advanced symptomatic aids, or people with a 105 temperature in that criteria. They were excluded.
 So would I have treated him? No. Based on common sense, clinical judgment, that doesn't have to do with criteria. And at least one of the criteria, at least the fundamental one, looking at efficacy, would I be in a position of needing to guess or choose a time that is not exactly clear to either say aye or nay? The truth is, I don't know. . . .
Trial Transcript at 438-439. Dr. Conomy further testified that he would not have administered TPA to appellant. In short, Dr. Conomy's testimony both during his deposition and during trial never deviated with respect to the essential issue in this case, which is whether appellant was an appropriate candidate for TPA. As noted by appellees Dr. Frazier and Sunbury Family Practice in their brief, "[i]n this case, there was no "new" defense theory advanced by or through Dr. Conomy. His opinion that TPA was not appropriate was unchanged."
Appellees presented further evidence at trial that appellant did not meet the inclusion criteria for administration of TPA. When asked whether appellant met such criteria, Dr. Janiak, a defense expert, responded as follows:
He did not.
Q. Tell me why.
 A. I don't think these are — this is enough of a deficit to justify the risk of TPA. I think most patients would be very relatively happy to live with this minor deficit rather than take a risk of dying, so I don't know any of us who would give it.
See Videotaped Deposition of Dr. Janiak at 31. The following testimony was adduced when Dr. Janiak was asked whether the standard of care required Dr. Haynes to either give appellant TPA in the emergency room or offer him TPA as a treatment option:
A. Neither would be the standard.
 Q. Would the basis for that be what you have told a minute ago, mainly that he did not meet the criteria for defined onset of symptoms and separately that he didn't meet the criteria as respects the significance of this deficits?
 A. Exactly. I mean, look at this from the emergency physician's standpoint. You're faced with a patient who on examination has very minor deficits. You wouldn't give TPA to this patient for any reason because you think it would be completely wrong to do so.
 Knowing that, why would you go back and grill that patient incessantly about the onset of these symptoms that are too minor to give the drug anyhow? It doesn't — it's a fruitless exercise. So either way, the history of the time was not rock solid enough to deal with it, but there was no indication physically to give the patient TPA anyhow, so it just was irrelevant.
 Q. Doctor, let me ask you one final thing, and I think we've touched on it already. I would like for you hypothetically to place yourself in the Grady Hospital emergency room on the morning of June 5 or if you would prefer operate under the assumption that instead of going to Grady at 7:25 he would have walked into your emergency room. Based upon everything you've said so far this afternoon, would you have given Mr. Adkins TPA or would you have offered him TPA as a treatment option?
A. I would not.
Videotaped deposition of Dr. Janiak at 36-38.
Appellee Dr. Haynes also testified in her own defense that she did not administer TPA to appellant because there was no way for her to determine the onset of appellant's symptoms and because appellant's "symptoms were too minor to justify the risks associated with the drug". Trial Transcript at 334.
Based on the foregoing, we find that Dr. Conomy's "surprise" testimony, in light of the other testimony adduced at trial, was not so prejudicial as to impact the outcome of the trial. Furthermore, as is stated above, after denying appellants' motion for a mistrial, the trial court, at appellees' request, gave a curative instruction to the jury. The trial court specifically instructed the jury to "ignore any testimony, delete from your memory banks any testimony of Dr. Conomy regarding lacunar infarct as a cause of Mr. Adkins' paralysis". Trial Transcript at 507. A jury is presumed to follow a trial court's instructions, including curative instructions. State v. Tibbetts (2001),92 Ohio St.3d 146. Considering the totality of testimony adduced at trial from Drs. Janiak, Conomy and Haynes over the four day trial that appellant did not meet the inclusion criteria for administration of TPA, we cannot say that Dr. Conomy's "surprise" testimony "tainted the trial beyond the aid of any curative instruction". See Valleau v. Lynn (March 6, 1998), Hamilton App. No. C-970340, unreported. In contrast to theValleau case, which was cited by appellants in their brief, the issue of fault in this matter was not close. Rather, there was overwhelming evidence that appellees were not negligent in failing to administer TPA to appellant.
In conclusion, we find that the trial court did not err in denying appellants' motion for a mistrial since, based on the foregoing, the trial court's decision was not arbitrary, unconscionable or unreasonable.
Appellants' sole assignment of error is, therefore, overruled.
Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.
By EDWARDS, J., FARMER, P.J. and BOGGINS, J. concur
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Delaware County Court of Common Pleas is affirmed. Costs to appellants.
[1] The "Cat" in Cat scan stands for computerized axial tomography. A cat scan is an image made by computed tomography. See Merriam-Websters Collegiate Dictionary (10th edition).
[2] TPA stands for tissue plasminogen activate.
[3] See Hanna v. Redlin Rubbish Removal, Inc. (April 1, 1992), Summit App. No. 15280, unreported.
[4] Dr. Prockop's video deposition was presented at trial.