[Cite as *State v. Mehno*, 2014-Ohio-4150.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                                     )
                                                   )
     PLAINTIFF-APPELLEE,                         )
                                                   )         CASE NO. 13 CO 28
V.                                                 )
                                                   )            OPINION
ANTHONY C. MEHNO,                                  )
                                                   )
     DEFENDANT-APPELLANT.                        )

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Criminal Appeal from Court of Common Pleas of Columbiana County, Ohio Case No. 11CR281 |
| JUDGMENT: | Affirmed |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee | Robert Herron Prosecutor Timothy McNicol Assistant Prosecutor 105 S. Mark St. Lisbon, Ohio 44432 |
| For Defendant-Appellant | Attorney Kenneth J. Lewis 1220 West 6th St., Suite 502 Cleveland, Ohio 44113 |

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: September 19, 2014

DONOFRIO, J.

{¶1} Defendant-appellant, Anthony Mehno, appeals from a Columbiana County Common Pleas Court judgment convicting him of rape and the resulting sentence, following a jury trial.

{¶2} This case involves M.E. In late 2009, M.E.'s mother, J.E., became close friends with Ashley Goudy (n.k.a. Ashley Mehno). The two spent time together "hanging out" and Ashley also became close with M.E., who was 15 years old at the time. Ashley had a two-year-old daughter and M.E. was frequently her babysitter. Ashley began to date appellant sometime in 2010 and J.E. and M.E. became acquainted with him through Ashley.

{¶3} According to M.E. and J.E., on April 28, 2010, appellant called M.E. to ask if she could babysit that night. Apparently, Ashley was in jail at the time. M.E. agreed and appellant picked her up at her home and drove her to Ashley's apartment. He dropped her and the baby off but did not come into the apartment. M.E. had brought her pajamas and planned to spend the night because appellant stated he would not be back that night. M.E. watched movies with the baby and put her to bed. She then changed into her pajamas and went to sleep in Ashley's bed.

{¶4} According to M.E., she awoke around 3:00 a.m. to find her pajama pants and underwear removed and appellant on top of her having sex with her. She punched him and kneed him. Then M.E. grabbed her pajamas and underwear and ran out of the apartment. M.E. called her mother's boyfriend, who in turn called J.E. J.E. came and picked M.E. up. M.E. told J.E. that appellant had raped her.

{¶5} Appellant denies that he had any contact with M.E. that night. He even denies calling M.E. to babysit, picking her up, and bringing her to Ashley's apartment.

{¶6} J.E. brought M.E. to the hospital the following day. M.E. stated J.E. tried to convince her to go to the hospital sooner but she resisted. A physical exam and rape kit were performed at the hospital. The treating physician stated M.E.'s right hand injuries were consistent with punching someone. M.E. disclosed to the physician that "Anthony" raped her. Additionally, M.E. brought with her the clothes and underwear she had worn on the night of the rape. These items were taken as

evidence.

**{¶7}** The rape kit was sent to the Ohio Bureau of Criminal Identification and Investigation (BCI) for analysis along with a sample of appellant's DNA. DNA found on a vaginal swab from M.E. was consistent with appellant's DNA. Likewise, DNA consistent with appellant's DNA was found on the underwear M.E. was wearing that night.

**{¶8}** On October 27, 2011, a Columbiana County Grand Jury indicted appellant on one count of rape, a first-degree felony in violation of R.C. 2907.02(A)(2); one count of sexual battery, a third-degree felony in violation of R.C. 2907.03(A)(3); and one count of unlawful sexual conduct with a minor, a fourth-degree felony in violation of R.C. 2907.04(A).

**{¶9}** The matter proceeded to a jury trial. The jury found appellant guilty of all charges. At a later sentencing hearing, the trial court found the three offenses to be allied offenses of similar import and merged them for sentencing. Plaintiff-appellee, the State of Ohio, elected for the court to sentence appellant on the rape offense. The court sentenced appellant to seven years in prison for rape. It also designated appellant a Tier III Sex Offender pursuant to R.C. 2950.01, et seq.

**{¶10}** Appellant filed a timely notice of appeal on June 25, 2013.

**{¶11}** Appellant raises four assignments of error, the first of which states:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING THE STATE'S MOTION IN LIMINE, EXCLUDING A DUPLICATE COPY OF AN AFFIDAVIT PURSUANT TO THE OHIO RULES OF EVIDENCE.

**{¶12}** Prior to trial, the state filed a motion in limine to preclude appellant from introducing or referring to a duplicate of an affidavit purportedly signed by M.E. The state argued a genuine issue existed as to the duplicate affidavit's authenticity. It noted that appellant only had a photocopy of the affidavit and the original had not been located. It further stated that M.E. denied signing the affidavit.

**{¶13}** In the affidavit, M.E. purportedly stated she was unsure whether the man who raped her was in fact appellant because she never saw his face, she did not believe it was appellant because he did not seem like someone who would do something like that, and the panties she turned over to the police belonged to Ashley Mehno. (State's Ex. 8B).

**{¶14}** The trial court heard extensive testimony regarding the production of the original affidavit from M.E., Ashley Mehno, and appellant's former attorney. It granted the state's motion and did not permit the introduction of the duplicate affidavit.

**{¶15}** Appellant argues the exclusion of the duplicate affidavit was highly prejudicial to him because much of his defense relied on it. He points out that the affidavit contradicts M.E.'s trial testimony identifying him as her attacker. Appellant notes that the Rules of Evidence permit a duplicate to be used to the same extent as an original unless a genuine question is raised as to authenticity or it would be unfair to admit the duplicate under the circumstances. He argues the duplicate affidavit was admissible here because his former attorney, who was present when the affidavit was made, testified that the duplicate was an exact copy of the original.

**{¶16}** A trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Mays*, 108 Ohio App.3d 598, 617, 671 N.E.2d 553 (8th Dist.1996). More specifically, the decision to admit a duplicate, instead of an original document, is within the trial court's sound discretion. *State v. Tibbetts*, 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001). Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶17}** To prove the content of a writing, the original writing is generally required. Evid.R. 1002. However, a "duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003. The party seeking to exclude a duplicate has the burden of

demonstrating it should be excluded. *Tibbetts*, 92 Ohio St.3d at 160. Thus, the burden in this case was on the state.

**{¶18}** The trial court listened to extensive testimony regarding the duplicate affidavit before ruling that it was inadmissible.

**{¶19}** M.E. testified that sometime in July 2012, Ashley contacted her on Facebook. (Tr. 283). The two later spoke on the phone and Ashley asked M.E. if she would go with her to an attorney's office in Youngstown because she was afraid that appellant was harming her daughter. (Tr. 282). M.E., who was still a minor, agreed to go with Ashley because she loved Ashley's daughter. (Tr. 282-283). M.E. stated that she went with Ashley and Ashley's male friend, who drove, to an attorney's office in Youngstown. (Tr. 284-285). She testified that the attorney asked her if she believed appellant would do something to Ashley's daughter and she stated "yes." (Tr. 285). M.E. testified that she then signed a handwritten paper to that effect. (Tr. 285). She stated that the questions on the paper that she signed only had to do with Ashley's daughter. (Tr. 285-286). M.E. stated the attorney started to ask her questions about the pending rape case but she refused to answer them. (Tr. 286).

**{¶20}** The prosecutor showed M.E. the duplicate affidavit. (Tr. 281). M.E. stated that it was not the document that she signed although she agreed that it had her signature on it. (Tr. 282, 291).

**{¶21}** Ashley testified that it was M.E. who contacted her via Facebook. (Tr. 298). She stated that M.E. told her that she wanted to put everything behind her. (Tr. 298). Ashley stated she and M.E. then spoke on the phone and she mentioned to M.E. that she could go to appellant's attorney's office. (Tr. 299). As a result of this conversation, Ashley stated that she, M.E., and M.E.'s step-sister went to appellant's attorney's office in Youngstown. (Tr. 300). She stated that appellant's friend Billy Falata drove them there. (Tr. 300).

**{¶22}** Once they arrived at the attorney's office, Ashley stated that the attorney and M.E. created an affidavit. (Tr. 301). She stated the attorney typed

questions on his computer and M.E. typed the answers. (Tr. 301-302). She then identified the duplicate affidavit. (Tr. 302, 303). She stated the affidavit was also signed by a notary. (Tr. 302). Ashley testified that there was no discussion about her daughter. (Tr. 303). After leaving the attorney's office, Ashley stated that they drove to M.E.'s house to retrieve her student I.D., which they then faxed to the attorney's office from Giant Eagle. (Tr. 303).

{¶23} Ashley initially testified that M.E. never signed a paper copy of the affidavit. (Tr. 307). She stated that she witnessed M.E. sign on a pad on the computer. (Tr. 307). She stated that it was similar to signing on a pad using a stylus at a store when paying with a credit card. (Tr. 313). She stated that she never saw a printed document. (Tr. 308, 313). But the next day, upon further questioning Ashley changed her testimony. She stated that she had been mistaken when she said M.E. signed a computer pad and instead stated that she saw M.E. sign a piece of paper. (Tr. 415).

{¶24} Appellant's former attorney also testified regarding the affidavit. He stated that he received phone calls from appellant's mother and Ashley in July 2012 indicating that M.E. had something to say about the case. (Tr. 342). He set up a meeting. (Tr. 343). He stated that Ashley, M.E., and M.E.'s female cousin came to his office. (Tr. 344). He stated the gist of M.E.'s statement was that she could not identify her assailant. (Tr. 344). He testified that he then created a header and footer for the affidavit on his computer and gave the computer to M.E. so that she could type a narrative. (Tr. 345). He then typed some follow-up questions for her and she typed the answers. (Tr. 345). The attorney stated there were no handwritten documents. (Tr. 345-346). He stated that he printed the document from his computer, M.E. signed it, he signed it, and another witness signed it. (Tr. 346). He stated there was no discussion about Ashley's daughter. (Tr. 354).

{¶25} The attorney identified the duplicate affidavit as a copy of the one that was created that day on his computer. (Tr. 346, 347). He stated that after everyone signed it, he put the original in his file. (Tr. 346). He testified he did not know what

happened to the original. (Tr. 346). He stated he made at least two copies. (Tr. 347). He stated he turned his file over to appellant at the last pretrial he was involved in. (Tr. 348). Appellant's current counsel acknowledged that he received the file in court at that time. (Tr. 350).

{¶26} On cross-examination the prosecutor asked appellant's former attorney if he had any questions concerning the veracity of the affidavit and the circumstances under which it was obtained. (Tr. 360). The attorney stated "no." (Tr. 360). However, the prosecutor noted for the record that it took the attorney approximately 60 to 90 seconds before he answered that question. (Tr. 368).

{¶27} Additionally, on cross-examination, the attorney admitted that he allowed appellant to enter a guilty plea to sexual battery as part of a plea deal even though he knew the alleged affidavit existed.[1] (Tr. 358).

{¶28} Given the contradicting testimony surrounding the duplicate affidavit, the trial court did not abuse its discretion in disallowing it. The trial court found there was "substantial conflict in the testimony with regard to the very existence of this alleged document and its execution." (Tr. 420). It noted there was some hesitancy on appellant's former attorney's part in his testimony, he was slow to furnish the affidavit to the state, and he allowed appellant to enter a guilty plea when this alleged document was in existence. (Tr. 420). Therefore, the court did not allow the duplicate affidavit into evidence.

{¶29} Pursuant to Evid.R. 1003, a duplicate is not admissible if a genuine question is raised as to the authenticity of the original.

{¶30} Here, numerous questions were raised concerning the creation and contents of the original affidavit. M.E. stated the affidavit she signed was handwritten and dealt only with Ashley's daughter. She denied ever signing a type-written affidavit recanting her identification of appellant as her attacker. Initially, Ashley was unequivocal in her testimony that M.E. signed the affidavit only on the attorney's computer using a stylus. The next day, however, she changed her testimony and

---

1 Appellant later filed a motion to withdraw his guilty plea, which the trial court allowed.

stated that M.E. signed a paper affidavit. Ashley's testimony was highly suspect due to many inconsistencies. The attorney testified that M.E. typed a narrative on his computer, he typed some follow-up questions, and M.E. typed responses. He stated he then printed the document, which he, M.E., and a witness signed.

{¶31} Moreover, nobody could account for what happened to the original affidavit. And, as the trial court noted, appellant's former attorney was willing to have him enter a guilty plea while he was in possession of an affidavit from the victim in which she allegedly recanted her identification of appellant as her attacker.

{¶32} Given the uncertain circumstances surrounding the creation of the original affidavit, the state met its burden in raising a genuine question as to the original affidavit's authenticity. Therefore, the trial court did not abuse its discretion in excluding the duplicate affidavit from evidence.

{¶33} Accordingly, appellant's first assignment of error is without merit.

{¶34} Appellant's second assignment of error states:

THE EVIDENCE PRESENTED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT CONVICTIONS OF RAPE, SEXUAL BATTERY AND UNLAWFUL SEXUAL CONDUCT WITH A MINOR.

{¶35} Here appellant contends his conviction was not supported by sufficient evidence. Appellant states this assignment of error is meant to supplement his first assignment of error. Specifically, he contends that the admission of the affidavit coupled with the inconsistencies in the evidence would have resulted in a different outcome in his trial. The inconsistencies appellant refers to are in M.E.'s testimony and that of her mother J.E. Appellant points out there was testimony that he did not have a key to Ashley's apartment, did not have a driver's license, and did not have a vehicle. However, M.E. and J.E. testified that appellant picked M.E. up on the night in question and drove her to Ashley's apartment to babysit. Additionally, he points out that M.E. and J.E. did not call police or go the hospital until 20 hours after the alleged rape. And he notes that J.E. testified that he was in her driveway shortly after

the alleged rape and J.E. did not call the police. Appellant further points to his own testimony that he did not rape M.E. and to Ashley's testimony that the underwear in which appellant's DNA was found belonged to her and M.E. took the underwear from her room.

**{¶36}** Although couched in terms of sufficiency, appellant's argument suggests that his conviction is against the manifest weight of the evidence. Therefore, we will review both whether appellant's conviction is supported by sufficient evidence and whether it is against the manifest weight of the evidence.

**{¶37}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113.

**{¶38}** The jury found appellant guilty of rape, sexual battery, and unlawful sexual conduct with a minor. Because these were allied offenses of similar import, the trial court merged the offenses for sentencing and sentenced appellant only on the rape conviction.

**{¶39}** Appellant was convicted of rape in violation of R.C. 2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶40}** We must examine the evidence to determine whether it supports appellant's conviction.

**{¶41}** Detective Dave Talbert testified that according to Columbiana County Jail records Ashley was in the Columbiana County Jail from April 27, 2010, at 12:38

p.m. until April 29, 2010, at 4:26 p.m. (Tr. 196).

**{¶42}** Donald Weyand, J.E.'s boyfriend, testified that he awoke around 3:00 a.m. on April 29, 2010, when M.E. called him. (Tr. 210). Weyand stated that M.E. was crying and asked him to get ahold of her mother to pick her up. (Tr. 211). He stated M.E. called him instead of J.E. because M.E. knew J.E. was out of minutes on her cell phone. (Tr. 211). Weyand had just added minutes to J.E.'s cell phone, however, so he was able to call J.E. and told her she needed to go pick up M.E. (Tr. 211-212). Weyand then got back on the phone with M.E. and talked to her until J.E. arrived. (Tr. 212).

**{¶43}** J.E. testified that she and Ashley met at work and became friends several months prior to the incident at hand. (Tr. 221). She stated she and M.E. both became friends with Ashley, who then began dating appellant. (Tr. 222). J.E. testified that on April 28, 2010, appellant drove to her house and picked up M.E. to babysit. (Tr. 224). She said she saw appellant driving. (Tr. 224). Appellant told J.E. that he was not going to be home and that M.E. would be alone with the child. (Tr. 225). Around 3:30 a.m., J.E. got a call from Weyand, who told her that something was wrong with M.E. and she needed to go pick her up. (Tr. 226). J.E. left to pick up M.E. (Tr. 226). When she picked up M.E. from the apartment parking lot, J.E. stated that M.E. was shaking and hysterical. (Tr. 228). J.E. drove M.E. home and M.E. told J.E. that appellant raped her. (Tr. 232). J.E. tried to convince M.E. that she needed to go to the hospital, but M.E. resisted. (Tr. 232-233). Approximately 24 hours later, M.E. agreed to go to the hospital. (Tr. 233).

**{¶44}** J.E. also identified M.E.'s pajama pants, underwear, and matching bra. (Tr. 228-231). She stated that she did M.E.'s laundry and had laundered those items many times. (Tr. 228-231). J.E. stated that they brought those clothes to the hospital in a bag. (Tr. 236).

**{¶45}** Finally, J.E. testified that later in the afternoon of April 29, Ashley came to her house with appellant in order to retrieve her cell phone. (Tr. 237). She stated she gave Ashley the phone, told her what had happened, and told them to leave.

(Tr. 238).

**{¶46}** M.E. testified that she became acquainted with appellant through Ashley. (Tr. 428). She stated that she babysat for Ashley both at her house and at Ashley's apartment. (Tr. 429). On April 28, 2010, M.E. testified appellant called her and asked if she would babysit because Ashley was in jail. (Tr. 431). She stated that appellant and the baby came and picked her up. (Tr. 431). Appellant told M.E. that he was going out with a friend and staying at the friend's house. (Tr. 432). M.E. brought pajamas and was prepared to spend the night at Ashley's apartment. (Tr. 432). They went to Ashley's apartment where appellant dropped off M.E. and the baby. (Tr. 433). M.E. stated that she locked the door to Ashley's apartment and watched movies with the baby until she fell asleep. (Tr. 433-434). M.E. then changed into her pajamas and went to sleep in Ashley's bed, next to a toddler bed where the baby slept. (Tr. 434-435).

**{¶47}** M.E. testified she slept until 2:00 or 3:00 a.m. when she awoke to appellant lying directly on top of her with his penis inside her vagina. (Tr. 436). She stated she saw appellant's face and was sure it was him. (Tr. 436). When she woke up with appellant on top of her, M.E. stated her pajama bottoms and underwear were beside the bed. (Tr. 437). M.E. said appellant covered her mouth so she could not yell and she bit his hand. (Tr. 437-438). She then punched him in the face and kneed him in the testicles. (Tr. 438). M.E. stated this caused appellant to get off of her and she grabbed her clothes and ran downstairs. (Tr. 438-439).

**{¶48}** M.E. stated that she put her underwear and pajama pants on and ran out of the apartment without her shoes and socks. (Tr. 440). She identified the pajama pants, underwear, and bra that she was wearing that night. (Tr. 441-442; State Ex. 1, 2, 3). She stated that her grandfather purchased the bra and underwear set for her when they were shopping at Wal-Mart. (Tr. 443).

**{¶49}** Once outside, M.E. stated that she called Weyand on Ashley's phone, which she grabbed from the counter when she fled from the apartment. (Tr. 443-444). She called Weyand instead of J.E. because she thought J.E. was out of

minutes on her phone. (Tr. 445). M.E. stated that J.E. called her back and told her she was on her way to get her. (Tr. 445). When J.E. arrived, M.E. ran to the truck and J.E. took her home. (Tr. 446). M.E. stated that J.E. wanted to take her to the hospital but M.E. did not initially agree. (Tr. 446-447).

{¶50} M.E. testified that she eventually agreed to go the hospital. (Tr. 448). When she went to the hospital she was wearing different clothes, but she brought the pajamas and underwear she wore immediately after the rape with her on a police officer's instructions. (Tr. 449). M.E. specifically testified that the underwear she brought to the hospital, which she put on immediately after the rape, belonged to her and not to Ashley. (Tr. 477). She once again testified her grandfather bought the matching bra and underwear set when she was shopping with him at Wal-Mart. (Tr. 477-478). She stated that she and Ashley sometimes shared jeans and tee-shirts but they never shared underwear. (Tr. 477).

{¶51} Dr. Paul McPherson was the emergency room physician who examined M.E. and collected evidence from her for the rape kit. Dr. McPherson testified that M.E. told him that she went to her mother's friend's house to babysit, fell asleep, and woke up with someone named Anthony raping her. (Tr. 493). M.E. also told Dr. McPherson that she struck him once or twice, got her clothes, and got away. (Tr. 493). Dr. McPherson examined M.E.'s right hand and noticed some abrasions on her knuckles. (Tr. 494). He stated the abrasions were consistent with someone who had struck someone else with their fist. (Tr. 494). Dr. McPherson also testified that he swabbed deep inside M.E.'s vagina and packaged up the swab as part of the rape kit, which he turned over to the police. (Tr. 500-501).

{¶52} Linda Eveleth is a forensic scientist at BCI who performs DNA analysis. Eveleth testified that the vaginal swab from M.E. revealed two DNA profiles, one was consistent with M.E. and the other was consistent with appellant. (Tr. 395). From that, Eveleth concluded that appellant could not be excluded as the source of the semen on the vaginal swab. (Tr. 396). Eveleth stated that the DNA profile that was consistent with appellant's DNA was present in only one in 173,900 people. (Tr. 396-

397). Eveleth additionally testified that she tested a cutting from the underwear that was submitted from M.E. (Tr. 397-398). She stated that two DNA profiles were present on the underwear, one was consistent with M.E. and the other was consistent with appellant. (Tr. 398). Eveleth testified that the DNA profile that was consistent with appellant's DNA was present in only one in twenty quintillion, two hundred and forty-five billion people. (Tr. 399). Eveleth testified that there was no other DNA profile detected on the underwear. (Tr. 398).

{¶53} This evidence is sufficient to support appellant's conviction, especially when construed in the light most favorable to the state. M.E.'s testimony alone provides sufficient evidence to support the conviction. She testified she went to sleep wearing underwear and pajamas, that when she awoke her underwear and pajamas were next to the bed, and that she awoke with appellant on top of her raping her. She identified appellant in court as the man who raped her. Additionally, DNA consistent with appellant's DNA was found inside M.E.'s vagina and on the underwear she put on immediately after the rape. Thus, there is sufficient evidence to support appellant's rape conviction.

{¶54} Next, we must consider whether appellant's conviction was supported by the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶55} Yet granting a new trial is only appropriate in extraordinary cases where

the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶56} In examining whether appellant's conviction was against the manifest weight of the evidence, we must also consider the evidence presented by the defense. Ashley and appellant both testified in appellant's defense.

{¶57} Ashley testified that she met J.E. at work and she and J.E. became good friends. (Tr. 539). She also became close with M.E. (Tr. 540). Ashley stated that M.E. occasionally babysat for her. (Tr. 542). She also testified that she gave M.E. clothes, including underwear. (Tr. 545).

{¶58} Ashley testified that at the time of the alleged rape, she was in jail on a warrant for complicity to petty theft. (Tr. 549). She stated appellant was to watch her child while she was in jail. (Tr. 550). But she stated appellant did not have access to her apartment. (Tr. 550). She stated he was not permitted in her subsidized housing apartment because he was a convicted felon. (Tr. 547). Ashley also stated that appellant's driver's license was suspended and neither one of them owned a car. (Tr. 537. 563).

{¶59} Ashley testified she was released from jail on Thursday afternoon. (Tr. 551). She stated her father then drove her to J.E.'s house because M.E. had borrowed her phone and she wanted to pick it up. (Tr. 552). Ashley stated that when she got to J.E.'s house, J.E. was yelling that appellant raped M.E. (Tr. 552). Ashley

stated she immediately confronted appellant and he had no idea what she was talking about. (Tr. 553).

**{¶60}** Additionally, Ashley testified that the bra and underwear set M.E. stated she wore the night of the rape actually belonged to her. (Tr. 553-554). Ashley stated M.E. must have helped herself to those items. (Tr. 554). She stated she allowed M.E. to help herself to clothes. (Tr. 554).

**{¶61}** Appellant testified that he did not have a key to Ashley's apartment and had never been in Ashley's apartment without her being there. (Tr. 576). He also testified he did not have a driver's license and did not own a car. (Tr. 577).

**{¶62}** Appellant testified that when Ashley reported to jail, he was to take care of Ashley's baby. (Tr. 579-580). Appellant stated he did not call M.E. to babysit. (Tr. 580, 584). Appellant testified that he did not rape, sexually assault, or have physical contact with M.E. at all. (Tr. 581-582).

**{¶63}** As an appellate court, we are permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶11. But we must give great deference to the fact finder's determination of witnesses' credibility. *Id.* We do so because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.*

**{¶64}** Appellant's testimony directly conflicted with M.E.'s testimony. The jury was left with making the determination as to whose testimony was more credible. The jurors were able to observe M.E. and appellant as they testified and use their observations in determining the veracity of the testimony. The jury found M.E.'s testimony to be more credible. The jury likely took into consideration evidence that corroborated M.E.'s testimony such as her statements to her mother and Dr. McPherson following the rape and, significantly, the DNA evidence.

**{¶65}** Given the above evidence, we cannot conclude that the jury lost its way in this case and created a miscarriage of justice. Appellant's conviction is supported

by the manifest weight of the evidence.

**{¶66}** Accordingly, because appellant's conviction is supported both by sufficient evidence and by the manifest weight of the evidence, appellant's second assignment of error is without merit.

**{¶67}** Appellant's third assignment of error states:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING THE STATE'S MOTION IN LIMINE, EXCLUDING THE DEFENDANT'S TESTIMONY REGARDING ALIBI.

**{¶68}** During opening arguments, appellant's counsel made a statement that appellant was not present at the time of the rape. (Tr. 170-171). The state objected. (Tr. 171). The court informed counsel that he should have filed a notice of alibi. (Tr. 173).

**{¶69}** Appellant's counsel later proffered for the record that had he been permitted, he would have called appellant's father to testify that appellant was at home with him on the night in question. (Tr. 593).

**{¶70}** In this assignment of error, appellant contends the court erred in not permitting his father to testify that appellant was at home on the night in question. He asserts that this information was disclosed to the state and the state was well aware of his address. Thus, appellant argues there was no prejudice to the state by his failure to file a notice of alibi that he was at home at the time of the alleged rape.

**{¶71}** Crim.R. 12.1 provides:

Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such

written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

**{¶72}** The Ohio Supreme Court identified three factors to consider in determining whether a trial court abuses its discretion in excluding evidence of an alibi: (1) whether the alibi testimony would surprise or otherwise prejudice the prosecution's case; (2) whether the defense was acting in good faith when it failed to give proper notice of the alibi; and (3) whether the admission of the evidence is necessary to ensure a fair trial. *State v. Dillard*, 7th Dist. No. 03 JE 32, 2005-Ohio-1656, ¶56, citing *State v. Smith*, 50 Ohio St.2d 51, 53, 56, 362 N.E.2d 988 (1977).

**{¶73}** As to the first factor, the court noted that had appellant filed a proper notice of alibi the state would have had an opportunity to investigate whether appellant was at home as he claimed by perhaps speaking with neighbors or doing other things to determine whether the alibi was valid. (Tr. 175). Thus, it seems the court concluded that appellant's alibi, which was first mentioned in defense counsel's opening statement, surprised the prosecution and would have prejudiced its case because it did not have the opportunity to investigate whether the alibi was valid.

**{¶74}** As to the second factor, there appears to be no evidence that the defense acted in bad faith in failing to disclose the alibi. Defense counsel stated that he did not anticipate this being a significant issue and he thought it was reasonable to believe that appellant would be at his own house. (Tr. 175, 176).

**{¶75}** As to the third factor, the exclusion of appellant's father's testimony that appellant was at home on the night in question was not necessary to ensure a fair trial. The evidence against appellant was overwhelming. M.E. testified unequivocally that appellant raped her. The DNA evidence found inside M.E.'s vagina and in the underwear she wore just after the rape supported M.E.'s testimony. M.E.'s testimony was further bolstered by J.E.'s testimony that she saw appellant pick up M.E. to babysit and that she picked M.E. up from Ashley's apartment in the early morning hours of April 29. And M.E.'s testimony was supported by Dr. McPherson's

testimony that M.E. reported to him that "Anthony" raped her. Additionally, the state was in possession of a statement by Ashley that appellant was at a friend's house on the night in question and would have used this evidence to rebut the alibi. (Tr. 593-594; State's Ex. 11). Thus, even if the trial court had permitted appellant's father to testify that he was home on the night in question, this testimony would not have altered the outcome of the trial.

{¶76} Based on these factors, the trial court acted within its discretion in disallowing appellant's father to testify as to an alibi.

{¶77} Accordingly, appellant's third assignment of error is without merit.

{¶78} Appellant's fourth assignment of error states:

THE TRIAL COURT ERRED IN SENTENCING THE DEFENDANT TOO HARSHLY.

{¶79} Appellant asserts the trial court erred in sentencing him to seven years in prison. He contends the court failed to consider the mitigating factors prior to sentencing him and seemed to have a "pre-determined outlook for accepting the position of a lengthy prison sentence."

{¶80} Our review of felony sentences is a limited, two-fold approach, as outlined in the plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶26. See *State v. Hill*, 7th Dist. No. 13 MA 1, 2014-Ohio-919, ¶20. First, we must examine the sentence to determine if it is "clearly and convincingly contrary to law." *Kalish*, at ¶26. (O'Conner, J., plurality opinion). In examining "all applicable rules and statutes," the sentencing court must consider R.C. 2929.11 and R.C. 2929.12. *Id.* at ¶¶ 13-14 (O'Conner, J., plurality opinion). If the sentence is clearly and convincingly not contrary to law, the court's discretion in selecting a sentence within the permissible statutory range is subject to review for abuse of discretion. *Id.* at ¶17 (O'Conner, J., plurality opinion). Thus, we apply an abuse of discretion standard to determine whether the sentence satisfies R.C. 2929.11 and R.C. 2929.12. *Id.* at ¶17 (O'Connor, J., plurality opinion).

**{¶81}** The trial court merged appellant's convictions for sentencing. Therefore, it only sentenced for the first-degree felony conviction of rape. The possible sentences for a first-degree felony at the time the offense was committed were three, four, five, six, seven, eight, nine, or ten years. Former R.C. 2929.14(A)(1).[2] Thus, appellant's seven-year sentence was within the statutory range.

**{¶82}** At the sentencing hearing the prosecutor noted several R.C. 2929.12 factors that applied in this case including that the physical/mental injury caused to the victim was exacerbated by her young age, the relationship between appellant and the victim facilitated the offense, appellant was on felony probation when the offense was committed, appellant has a pattern of drug and/or alcohol abuse, and appellant has shown no remorse. (Sentencing Tr. 2-5). The trial court stated that it agreed with the prosecutor's analysis of the sentencing factors and adopted his statements as findings of the court. (Sentencing Tr. 11).

**{¶83}** Additionally, in its judgment entry, the trial court stated that it considered the purposes and principles of sentencing including those set forth in R.C. 2929.11 and R.C. 2929.12. The court went on to find that appellant had a prior felony conviction; the victim was a minor; appellant had a connection through his then girlfriend, now wife, with the victim's mother that facilitated the offense; and appellant did not demonstrate any remorse for his conduct.

**{¶84}** Appellant claims the trial court failed to consider mitigating factors in sentencing him. But appellant fails to state what the mitigating factors might be in his case.

**{¶85}** R.C. 2929.12(C) sets forth factors that the court shall consider as indicating that the offender's conduct is less serious than that normally constituting the offense:

---

2 On September 30, 2011, H.B. 86 became effective. Through H.B. 86, the Legislature amended R.C. 2929.14 and changed the possible prison sentences for felonies. The current version of R.C. 2929.14(A)(1) extended the maximum possible prison time for a first-degree felony from ten years to eleven years. Because the offense in this case was committed in 2010, the former version of R.C. 2929.14(A)(1) applied.

(1) The victim induced or facilitated the offense.

(2) In committing the offense, the offender acted under strong provocation.

(3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.

(4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense.

**{¶86}** And R.C. 2929.12(E) sets forth factors the court shall consider as indicating that the offender is not likely to commit future crimes:

(1) Prior to committing the offense, the offender had not been adjudicated a delinquent child.

(2) Prior to committing the offense, the offender had not been convicted of or pleaded guilty to a criminal offense.

(3) Prior to committing the offense, the offender had led a law-abiding life for a significant number of years.

(4) The offense was committed under circumstances not likely to recur.

(5) The offender shows genuine remorse for the offense.

**{¶87}** There is no indication in the record that any of the R.C. 2929.12(C) or (E) factors applied in this case. And appellant does not cite to any of these factors that he alleges the trial court should have but failed to consider.

**{¶88}** Thus, there is no indication that the trial court abused its discretion in sentencing appellant.

**{¶89}** Accordingly, appellant's fourth assignment of error is without merit.

**{¶90}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

DeGenaro, P.J., concurs.